STATE OF NORTH CAROLINA v. THAROY DAVIS AND
JOSEPH C. FOSTER

No. 68

(Filed 18 August 1976)

1. **Homicide § 12— indictment in statutory language — sufficiency to charge first degree murder**

    A bill of indictment drawn in the words of G.S. 15-144 was sufficient to support a conviction of murder in the first degree.

2. **Constitutional Law § 31; Criminal Law § 80— discovery — fishing expedition — work product of police**

    A defendant is not entitled to the granting of a motion for a fishing expedition nor to receive the work product of police or State investigators.

3. **Criminal Law § 98— defendant's presence at trial — rule not extended to pretrial hearings**

    The strict rule that an accused cannot waive his right to be present at every stage of his *trial* upon an indictment charging a capital felony is not extended to require his presence at the hearing of a pretrial motion for discovery when he is represented by counsel who consented to his absence, and when no prejudice resulted from his absence.

4. **Constitutional Law § 30— 2 months between arrest and preliminary hearing — 3 months between preliminary hearing and trial — no denial of speedy trial**

    Defendants were not prejudiced where the record showed that one was arrested on 2 February 1974 and the other on 4 February 1974, counsel was hired by one defendant's parents and appointed for the other defendant, a preliminary hearing was held on March 7 and trial took place during the 10 June 1974 session of superior court, neither defendant demanded a preliminary hearing earlier than March 7 nor a trial before June 10, and there was no evidence that the State purposely delayed defendants' trial or that any prejudice resulted to either defendant by reason of any delay in the proceedings.

5. **Criminal Law § 92— defendants charged with same crime — consolidation proper**

    The trial court did not abuse its discretion in consolidating defendants' cases for trial where they were charged with the same crime.

6. **Criminal Law § 98— sequestration of witnesses — discretionary matter**

    The sequestration of witnesses is a matter in the trial judge's discretion.

7. **Criminal Law § 87; Witnesses § 1— witnesses not on list furnished defendant — allowance of testimony discretionary**

    Permitting witnesses, whose names were omitted from the list of potential witnesses furnished defendants prior to trial, to testify

was a matter within the discretion of the trial judge, not reviewable in the absence of a showing of an abuse of discretion.

8. **Jury § 7— jurors opposed to death penalty — challenge for cause**

The trial court did not err in allowing the State to challenge for cause four jurors, one of whom stated unequivocally that his mind was "made up" with reference to defendants' guilt or innocence, and three of whom stated without equivocation that their opposition to capital punishment was such that they would refuse to return a verdict of guilty of murder in the first degree even though the evidence satisfied them beyond a reasonable doubt of defendants' guilt.

9. **Homicide § 21— murder of store owner — robbery of store clerk — sufficiency of evidence**

In a prosecution of defendants for murder of a store operator during a robbery of the store employee, evidence was sufficient to be submitted to the jury where it tended to show that a clerk in the store identified defendants as two of the three men who were in the victim's store on the occasion of the robbery and homicide, the clerk related events which took place while the men were in the store, and the clerk's testimony tended to implicate all three in the robbery; a witness testified that on the day of the crime, from noon until 5:00 p.m., the defendants and two others were at her home, five miles from the victim's store; the father of one defendant testified that defendants and two others left his home, located four and one-half miles from the store, about 8:00 p.m. on the day of the crime; the brother of one defendant testified that after he, defendants, and another person left his father's house at 8:00 p.m. on the day they bought a jack for the other defendant's tape recorder and thereafter played basketball at a friend's house, they stopped at a store with a tree and gas tank in the yard, defendants went inside where they were joined a couple of minutes later by the fourth passenger in the car, leaving the brother alone in the car, and in two or three minutes the three came back to the car and drove away.

10. **Criminal Law § 87— voir dire examination — no leading questions**

In a prosecution for murder committed during the robbery of a store employee, the record reveals no extensive or prejudicial leading of the robbery victim by the solicitor on the *voir dire* to determine the competency of the victim's in-court identification of defendants.

11. **Criminal Law §⋅ 66— photographic identification — no impermissible suggestiveness** ⋅⋅

A robbery victim's photographic identification of defendants was not the result of impermissible suggestiveness, nor did it result from procedures creating a substantial likelihood of irreparable misidentification where the evidence tended to show that the victim had ample opportunity to observe the defendants at the time of the robbery; on different occasions officers showed the victim at least 60 black and white photographs of black males and the victim identified none of these as being photographs of the men she saw in the store on the night of the crime, though on three occasions a photograph of each defendant taken from his high school annual was among those shown

State v. Davis

her; about six weeks after the crime officers showed the victim albums containing color pictures of black males, and containing one current photograph of each defendant; the victim immediately identified defendants' photographs; and the officers at no time ·made any comment to the victim concerning the photographs being shown her or their progress in solving the case.

**12. Criminal Law §§ 21, 175— preliminary proceedings — rules of evidence relaxed**

In a hearing before the judge on a preliminary motion to determine the admissibility of evidence, the ordinary rules as to the competency of evidence applied in a trial before a jury are to some extent relaxed, though not suspended, for the reason that the judge with knowledge of the law is able to eliminate from the testimony he hears that which is immaterial and incompetent, and consider only that which tends properly to prove the facts to be found.

**13. Criminal Law § 66— voir dire on identification testimony — improper hearsay testimony — sufficiency of competent testimony to allow identification**

Testimony on *voir dire* by a robbery victim that defendants were the men she saw in the store on the night of the crime was competent and sufficient evidence, unaided by the hearsay testimony of another witness on *voir dire*, to sustain the trial court's findings that the victim's identification of defendants "was based on her independent observation at the time and scene of the robbery and homicide and was not influenced or tainted by other identification acts or procedures prior to the calling of the case for trial."

**14. Criminal Law § 116— failure of one defendant to testify — jury instruction — no error**

Where one defendant made no request for a jury instruction on his failure to testify, but the trial court interrupted his charge to ask if defendant desired such an instruction, the court's subsequent statement to the jury that defendant had the election to testify or not as he saw fit and that his failure to testify should create no presumption against him was not prejudicial to the defendant who did testify in his own behalf, even though the court failed to add that the defendant's silence should not influence the jury's decision in any way and that his failure to testify should not be considered against the testifying defendant.

**15. Homicide § 25— first degree murder — defendants acting together — instructions proper**

In a prosecution for robbery and first degree murder when the trial court's charge is construed as a whole, the jury must have understood the judge to mean that if they were satisfied beyond a reasonable doubt that defendants were acting together while in the course of or attempt to rob the murder victim's store, and that either one of them shot and killed the victim both would be guilty of first degree murder, but the issue of the guilt of each defendant was to be considered individually.

16. **Criminal Law § 126— polling the jury — ministerial act — performance by deputy clerk proper**

Polling the jury is clearly a ministerial act which, even in a capital case, may be performed by the deputy clerk of court in the presence and under the supervision of the trial judge.

17. **Criminal Law § 26; Homicide § 31— murder in perpetration of robbery — separate punishment for robbery improper**

Since defendants were both convicted of common law robbery of a store clerk and robbery was used to prove an essential element of the charge of murder in the first degree of the store owner for which each defendant was also convicted and sentenced, separate judgments imposing additional punishment for the robbery cannot stand.

18. **Constitutional Law § 36; Homicide § 31— first degree murder — death penalty invalid**

Because the U. S. Supreme Court in *Woodson v. N. C.,* ........ U.S.    , invalidated the death penalty provisions of G.S. 14-17, the statute under which defendants were convicted and sentenced to death, each defendant's motion in arrest of judgment imposing upon him the death penalty must be allowed. Common sense and rudimentary justice demand that the maximum permissible sentence of life imprisonment now be imposed upon a person convicted of first degree murder or rape committed between 18 January 1973, the date of *S. v. Waddell,* 282 N.C. 431, and the enactment of Ch. 1201, N. C. Sess. Laws (1973, 2d Session 1974) which rewrote G.S. 14-17, and the contention that the only permissible punishment is a maximum of ten years' imprisonment under G.S. 14-2 is unrealistic.

APPEAL by defendants from *Lanier, J.,* 10 June 1974 Session of the Superior Court of LENOIR, docketed as Case No. 51 at the Fall Term 1974, argued as Case No. 34 at the Spring Term 1975.

In separate bills of indictment, drawn under G.S. 14-87 and G.S. 15-144 and returned 11 March 1974, each defendant was individually charged (1) with the robbery of Edna Barwick with firearms and (2) with the murder of George A. Grant on 28 December 1973. The four cases were consolidated for trial. In separate verdicts each defendant was found (1) guilty of the common law robbery of Mrs. Barwick and (2) guilty of the first degree murder of George A. Grant. Upon the verdicts of guilty of first degree murder each defendant received a death sentence; upon the verdicts of guilty of common law robbery each defendant received a sentence of ten years imprisonment to commence upon the expiration of the sentences in the murder cases. Each defendant appealed from the sentence of death directly to this Court under G.S. 7A-27 (a). The appeal of each

State v. Davis

from his conviction of common law robbery was certified to this Court under G.S. 7A-27(a) for simultaneous, initial appellate review.

Uncontradicted evidence tends to show that the deceased, Grant, was the owner-operator of a general merchandising store located in a rural area in Lenoir County. In the front store yard, which was well lighted, were two gas pumps and a large oak tree. Shortly before 8:30 p.m. on 28 December 1973, Mr. Grant was killed during the course of a robbery of the store. Mrs. Barwick, who was employed by him as a clerk, was working at the time.

Immediately upon the impanelment of the jury, the court conducted a *voir dire* hearing to determine whether Mrs. Barwick would be allowed to make an in-court identification. On *voir dire,* she testified as to her observation of the men who committed the robbery and murder and identified defendants as participants. (Mrs. Barwick's testimony in this regard was essentially the same as her later testimony before the jury and, for that reason, it will be stated only in the resume of the evidence presented to the jury.) Relevant to the admissibility of her in-court identification the evidence presented at the *voir dire* tended to show the additional facts set out below.

Mrs. Barwick testified as follows:

Thirty or forty minutes after the incident she told investigating officers, Deputy Sheriff Garris, and SBI Agent Slaughter, that the men who entered the store were kind of tall, in their early twenties, not clean shaven, and they had short Afro haircuts. One of them was wearing a yellowish toboggan with a red and green stripe around it.

In the days that followed Mrs. Barwick said, on at least ten diffferent occasions the officers brought her eight to twelve black and white photographs of black men. Some of these photographs were submitted to her more than once, but she was not able to identify any of them. On one occasion she viewed a lineup of ten young black men at the Wayne County jail. She told Garris that none of the men who were in the store at the time of the robbery was in that lineup, but that the face of the second man from the left resembled the one who wore the toboggan. (At this point in her testimony she indicated Joseph Foster.)

It was not until 15 February 1974, when Officers Garris, Slaughter, and O'Quinn showed her two colored "photographic lineups" (State's Exhibits 8 and 9) that she identified the pictures of Davis and Foster as two of the men who were in Sparky Grant's grocery at the time of the robbery. She said that when she saw those pictures she "just knew they were the ones." In answer to the solicitor's question, "Now, how positive are you of your identification of these two young men?" Mrs. Barwick answered, "I just know I'm sure, yes, I know I'm sure."

Upon cross-examination on the *voir dire* Mrs. Barwick was asked if she had seen a striking resemblance between any person in the color photographs and any person in the black and white photographs which had been exhibited to her before 15 February 1973. She replied that she thought she had seen some before but she wasn't positive until she saw the color photographs. Counsel for defendants then handed her State's Exhibits 2-A through 2-J, and she indicated that she now thought picture 2-I was a picture of one of the persons who came in Grant's store on 28 December 1973; that it bore such a striking resemblance to defendant Davis it could have been a picture of the individual who was in the store. (This picture was not a picture of Davis.)

Mrs. Barwick said further that at the time she was shown Exhibits 8 and 9 she had read in the paper that certain individuals whom she did not know had been arrested for the robbery and homicide in question and were in the Lenoir County jail. She did not ask the officers who brought her the pictures, or anybody else, if the two she selected were persons they had in jail, and nothing said to her at the time indicated that they were. On previous occasions when she had asked them "if they had any evidence or anything," they had always told her they could tell her nothing. She was never told that the suspects were persons living in the community.

At the conclusion of Mrs. Barwick's testimony on *voir dire* the court heard SBI Agent Slaughter. His testimony, both on *voir dire* and before the jury, with reference to the descriptions which Mrs. Barwick gave him, as well as her account of the events which followed their entrance, was substantially the same. It will be summarized hereafter.

SBI Agent Slaughter and Deputy Sheriff Garris both testified on *voir dire* with respect to the pretrial identification

procedures they employed. According to them, they talked with Mrs. Barwick several times a week over a period of seven weeks. On at least six occasions they showed her photographs. On three of these occasions, all before 15 February 1973, black and white pictures of defendants, taken from a three or four-year-old high school annual, were among those exhibited. These pictures were first included among a group of "loose" photographs, introduced in evidence on *voir dire* as State's Exhibits 3A through 3Z and 3A-1-2. Later Mrs. Barwick was shown these black and white pictures of defendants as part of various "albums." These albums (State's Exhibits 4, 5, 6, and 7) were manila folders in each of which had been pasted four to five black and white photographs of black males. S-4 contained defendant Davis' picture; S-5 contained defendant Foster's; S-6 contained both pictures; S-7 contained no picture of either. Mrs. Barwick failed to identify the black and white photographs of defendants either as part of the loose ones presented to her or when included in the albums.

At this point in the *voir dire* hearing, Deputy Garris testified that the police had arrested one James Hodges in late January in connection with the present crime. Over defendants' objections Deputy Garris stated that Hodges told him that he, along with defendants, was at Grant's store on 28 December. He was outside when he heard a shot. He ran inside and saw defendant Davis with a gun in his hand holding a white lady while Foster was taking money from the cash register. Acting pursuant to this information, police arrested Davis and Foster in early February 1974.

Upon their arrest, defendants were photographed in color and their pictures placed in two albums. (State's Exhibits 8 and 9.) On 15 February, Agent Slaughter and Deputy Garris showed those albums to Mrs. Barwick. They asked her to look at the pictures and determine whether she could identify anybody among them. There was no discussion of the photographs. After looking "a couple of minutes" she identified the photographs of Davis and Foster as being the two people who had been in the store on the night of the robbery. Several minutes afterwards, she said to Agent Garris, "These are the two that were in the store, aren't they?" He told her he could make no statement as to any identification she made, and the officers then left.

At the conclusion of the *voir dire,* Judge Lanier found facts relative to Mrs. Barwick's opportunity to observe the men who committed the robbery and homicide. He also made substantial factual findings concerning the pretrial identification procedures employed by Agent Slaughter and Deputy Garris which were summarized above. Judge Lanier concluded "as a matter of law" that Mrs. Barwick's in-court identification of defendants Davis and Foster was based on her independent observation at the time and scene of the crime and it was not influenced or tainted by other pretrial identification acts or procedures.

To this ruling each defendant objected and excepted to the findings as being insufficient to support the court's conclusion "relative to the in-court identification." Each defendant "renewed his motion to suppress the testimony and identification by Edna Barwick." Each defendant also objected to the court's failure to find certain evidentiary facts which they contended diminished the reliability of Mrs. Barwick's identification.

After the court's determination that her in-court identification would be admissible Mrs. Barwick, a 44-year-old widow of ten years, testified before the jury, in summary, as follows:

For eight months prior to 28 December 1973 she had worked as a clerk in the store of Sparky Grant, a 45-year-old married man living with his family. She had been Sparky's "girl friend" for ten years and was in love with him. On Thursday evening, 27 December 1973, they had closed the store at 9:00 p.m. and gone to her home, ten miles away. At 4:00 a.m. she drove him back to the store, where she left him at 4:30 a.m. and returned home. When she reported for work at 10:30 that morning she had had four hours sleep. Except for the hour between 1:00 and 2:00 p.m. Mrs. Barwick remained in the store until after Grant was shot about 8:30 p.m.

At approximately 8:10 p.m. Grant and Mrs. Barwick were preparing to close the store. He was in the storage room, and she was stocking the drink cooler when Julia Green, who lived in a trailer in the store yard, came in and made a purchase. After Julia left, her daughter, Sandra, came in and also made a purchase. When Sandra left, Mrs. Barwick went back to restocking the drink cooler, standing about two feet from the front door.

A short time after Sandra left, Mrs. Barwick "glimpsed up" and saw two bare headed black males come in the door. At

State v. Davis

that time she did not "get a mental picture of what they looked like as individuals." One went to the beer cooler and one went back where she lost sight of him. This man she made no effort to describe or identify. However, she did see the one at the beer cooler, and she identified him as the defendant Tharoy Davis. She observed him pull back the door to the cooler, reach in with his right hand, and pull out a carton of Miller High Life beer. "I was looking at him," she said. At that time she thinks she did get a mental picture of him. She immediately filled the drink box and went inside the counter area to the cash register. At that time Grant was in the storage room.

It was only a few seconds after Mrs. Barwick lost sight of the man who went to the back that Davis placed the beer on the counter, and she "waited to put the beer in the bag and for him to pay [her]." She then faced him across the counter, a foot and a half away, and she observed him standing there. He had two or three dollar bills in his left hand but made no attempt to pay her. Mrs. Barwick's first effort to bag the beer was unsuccessful because the bag she had pulled from under the counter was too small. She got another and was putting the carton in the bag when she heard a loud gunshot in the back of the store. At that time there was nobody in the store but the two men, Grant, and Mrs. Barwick.

The shot was followed immediately by the sound or someone running from the back to the front of the store, on her left as she faced the back of the store. At the same time she was also conscious that the man who had brought the beer to the counter had moved and was "coming back of, to the inside of the counter" where she was. Then someone, whom she did not see, grabbed her from behind. She does not know who grabbed her because she did not see him but she thinks it was Davis, the man who was standing at the counter when the gun went off. He bent her head over with his body, and pulled her toward him. With his right arm around her he held both her arms so that neither was free.

Mrs. Barwick described herself at the moment as being "just scared to death" because she was afraid she was going to be shot. At that point someone snatched open the cash register, which contained between two and three hundred dollars, and she saw two hands taking out the money. At the time she was grabbed she heard someone enter the store, and a second

later she observed a third hand go into the register. In all, she saw three black hands remove money from the cash register, but at no time was she able to see whose hands they were although she was certain they belonged to three different people. The left hand of the person holding her went into the cash drawer. She saw another hand and a bare arm come across the counter where the beer was, and a third hand and arm came from the other side of the counter.

When all the money was withdrawn Mrs. Barwick heard two people leave the store. She turned and looked toward the door. There she saw a man, whom she later identified as defendant Foster, standing two or three feet from the door and three feet from her. He had on a yellowish toboggan with a green and red stripe around it, which he was trying to pull over his face. He was wearing baggy khaki pants and a faded blue jean coat. The man "stood there a few seconds trying to pull the toboggan down and then went out the front door running pretty fast." In all it was "just a few seconds" from the time she was grabbed before she saw Foster. At that time she got "a mental picture of him." In her opinion "the last one in the store and the last one out of the store was the same person."

Mrs. Barwick never saw either defendant or anyone else with a gun. She had never seen either one before the time of the robbery, and the individual who brought the beer to the counter never spoke a word to her.

As soon as the men left, Mrs. Barwick ran to the back of the store where she found Sparky lying on the floor dead. He had been shot in the temple.

Mrs. Barwick's first act was to call the Goldsboro telephone operator, seeking emergency assistance. At that time it was about 8:30 p.m. She then went to Julia Green's trailer. After telling Julia and her friend, Ed Sutton, that Sparky had been shot and requesting them to call the sheriff or the rescue squad, she returned to the store. After a few minutes alone at the store Mrs. Barwick, feeling so "nervous and shocked" that she "couldn't stand it longer," went back to the trailer somewhere between 8:30 and 8:45 p.m. and asked Julia and Sutton to come and stay with her. At her request Julia called Grant's brother, and Sutton called Mrs. Grant.

In due course Lenoir County Deputy Sheriff Garris and SBI Special Agent Slaughter came to the store. Mrs. Barwick

State v. Davis

tried to tell them, as best she could, what had happened and to describe the persons who were in the store at the time of the shooting and robbery.

She told the officers that the three young blacks came into the store and she described two of them. The one she saw in the door, she described as wearing a beige or yellowish toboggan with a green and yellow stripe around it, khaki pants, and a faded-out blue jean coat. The one who got the beer looked like "he might have had a short Afro haircut" and looked like he was "kind of tall." He wore a blue knit shirt and dark pants, and didn't look "two clean shaven."

In response to the solicitor's questions Mrs. Barwick stated that she was positive "that the defendant Tharoy Davis was in Sparky Grant's grocery store on the night of December 28, 1973, purchasing beer at the time of the gunshot." She said she was also positive that "the defendant, Joseph Foster, was in Sparky Grant's grocery store near the door very shortly after the gunshot on the night in question."

Julia Green testified that she went to the store about 8:05 p.m., stayed only a few moments, and returned home. Her daughter, Sandra, went to the store immediately thereafter and was gone only several minutes. At about 8:30 p.m. Mrs. Barwick came to her trailer visibly shaken and crying. Mrs. Barwick told her "that three colored guys had shot Sparky." Julia's daughter, Sandra, testified that when she went to the store she saw Mr. and Mrs. Bowden, whom she knew. He was sitting in a big green car near the gas pumps. In the store she saw Mrs. Bowden with whom she later went outside. At that time Mr. Grant was outside the store at the ice machine getting Mrs. Bowden some ice. The Bowdens drove away.

Clarence Jones, Jr., a witness for the State, whose name was not furnished to defendants prior to trial, testified over their objection, in summary, as follows:

Around 8:00 p.m. on 28 December 1973 Jones left his home and drove three miles to Sparky Grant's grocery store. As he went into the store yard he saw a late model Mercury, either blue or green, leave the gas pumps. He saw no other vehicles in the immediate vicinity of the store. As he entered the store he saw Mrs. Barwick and Sparky Grant standing at the counter together. They were not engaged in conversation, and the place

State v. Davis

seemed very quiet to him. When he spoke to them and remarked that he wanted something to eat they made no response. During the five or six minutes he was in the store buying some cakes and bananas, Sandra Green came in and made a purchase. To his knowledge, only Mr. Grant, Mrs. Barwick, and Sandra Green were in the store.

John D. Foster, the 20-year-old brother of defendant Joseph Foster, aged 21, and a first cousin of defendant Davis, was also under indictment for the murder of Sparky Grant. He was not tried with defendants but was called as a witness for the State. He gave testimony on direct examination which tended to show:

On Friday, 28 December 1973, he and Joseph were home on leave from the Army. John D. was staying with his friend, Ethel Mae Leftwridge; Joseph, with Tharoy Davis' mother, his aunt. During the afternoon of December 28th, John D., Joseph, Tharoy, and James Hodges, the 20-year-old brother of Ethel Mae Leftwridge, got together at Central Heights near Goldsboro. At that time John D. was "pretty well high." James Hodges, whose nickname is "Juney Boy," had also been drinking but not as much as John D. They all "went somewhere," first into Goldsboro to get a jack for Tharoy's tape recorder and then to Kinston, in Tharoy's white 1967 Mustang. Tharoy drove; Joseph sat on the front seat by him; John D. and Juney Boy occupied the back seat. They went to the home of Jack Foster, the father of John D. and Joseph, who lives in Lenoir County near Seven Springs, several times before they found him there about dark.

After 8:00 p.m. the four left Jack Foster's and started home. En route they stopped at a store in the yard of which was a gas tank and a tree, which could have been a pecan or an oak. Tharoy and Joe got out and went in the store. They had been gone a couple of minutes when James got out of the car. John D. remained in the back seat partly asleep. He believes James went in the store, for he came back and asked him for a dime to get a pack of cigarettes. John D. did not give him any money. James again left the car and in about two or three minutes they all came back. The car then went straight to Goldsboro. Tharoy "drives pretty fast and he took off regular, like he usually does." John D. "just fell off to sleep and did not hear any discussion in the car." John D. said that he was sure Tharoy Davis and Joseph Foster went in the store first and together and that Hodges went in thereafter.

On cross-examination John D. stated that he was "first arrested for this" on 3 February 1976 at Fort Jackson and brought back to Kinston; that he had discussed his testimony in this case with his own attorney and with the solicitor; that he was testifying for the State because he wanted to get out of jail; that because of statements which had been made to him concerning his testimony he hoped the case against him was going to be dismissed, and he believed it would be. His further testimony on cross-examination, summarized, except when quoted, tended to show:

The first day he was in the Kinston jail he told Special Agent W. L. Slaughter of the SBI that while he was at home on furlough in December he saw Tharoy Davis on the *Thursday* after Christmas and requested Tharoy to take him and Juney Boy to see his father, Jack Foster. Tharoy and Joe "had agreed" to do it. When they went they left the Central Heights area in the afternoon. He and Juney Boy had been drinking all the morning. After spending some time in Goldsboro the four arrived at Jack Foster's house in the late afternoon. He was not at home; so they went to Newman's Store to inquire about him. From there they went to Lou Kornegay's home where Tharoy, Joseph and Juney Boy played basketball until dark. From there they went to Uncle Smith's house for twenty minutes before returning to Jack Foster's home. He had just come in from a hog killing. Thereafter John D. and Joseph cut some firewood for their father and about 8:00 p.m. they left.

John D. further testified that at no time while he was with the other three that day did he see any guns or hear anyone discuss robbing a store. He did not see Tharoy or Joe with money in their hands, wadded up. He did not recall at what store they last stopped or how long they were there. He heard no gunshot on any occasion, and whenever they went back to Goldsboro they may have driven "a little bit faster, not much so. It was late at night." None of the four had a large Afro haircut, and all were clean shaven.

John D. also testified: "While we were at my father's house, my father asked Tharoy and Joe to come back on Saturday and take him and Mildred [his wife] to Farmville to Mildred's parents' house."

On redirect examination John D. said: "While we were at my dad's place I know that somebody tried to borrow some

money, just enough to get a loaf of bread. Me, Tharoy Davis, Joseph, my father and James, all tried to scrape up and get a loaf of bread. . . . " When questioned about whether he had accompanied defendants to Jack Foster's home on Thursday the 27th or Friday the 28th, he stated, "I talked to Tharoy Davis on Thursday. And he picked me up the next day. I don't know what day it was he picked me up."

Over defendants' objections John D. further testified that last summer—it could have been in the tobacco season—he saw Joseph with a .38 pistol. It was in a holster "just laying in the foot at the boot of his car."

Lucinda Carol Kornegay testified that she lived about five miles from Sparky Grant's grocery and that she knows Jack Foster, John D. Foster, Joseph Foster, Tharoy Davis, and James Hodges. On Friday, December 28, 1973, between 3:00 and 3:30 p.m., they came to her house in a white Mustang, and John D., Tharoy and Joseph played basketball until leaving at about 5 p.m.

The testimony of Jack Foster, the father of John D. and Joseph Foster, tended to show: He (Jack) lived four and one half miles from Sparky Grant's grocery. On Friday afternoon, 28 December 1973, he killed hogs for Mr. Nathan Hardy. Jack got home about 7:00 p.m., and thirty minutes later, Joseph, John D., Tharoy, and a boy Jack didn't know came to his house. This boy "had a boggan, tam, or what it looked like. . . . It was dark looking, it was about dark when they came there." While there John D. cut some wood for his father and unsuccessfully tried to borrow some money from him. Jack told Tharoy that he and his wife wanted to go to Farmville on Saturday, and Tharoy agreed to take them. After having something to eat the boys left at 8:00 p.m., and Jack did not see any of them again until Saturday morning when Joseph and Tharoy came by to take him and his wife to Farmville.

The State called as a witness William E. Smith, a deputy sheriff of Lenoir County, whose name was not on the list of witnesses furnished defendants prior to trial. Smith, who was the first officer to arrive at the scene, was substituted for Deputy Sheriff Pelletier, who became unable to testify after

the trial began. Over defendants' objection he testified, in substance, as follows:

On the night of December 28th he was on duty in the Seven Springs area of Lenoir County. About 8:23 p.m. he received a call to go to Sparky Grant's grocery to investigate an armed robbery and shooting. Upon his arrivel he saw Julia Green and Mrs. Barwick standing in the store yard. Mrs. Barwick came to his car and said, "He's been shot." She further advised him that she had been robbed. Upon entering the store he saw a six-pack carton of Miller High Life beer on the counter, the open cash register with only a few pennies in it, and some money on the floor. In the back of the store he found Sparky's body.

Mrs. Barwick then told Smith that three colored males had been involved. She described the first one "as being slender built with a blue jean jacket and blue jean trousers and a light beard. It looked like he hadn't shaved; it wasn't thick." The second man, she said, had a medium-light complexion, was heavy set, small and "the hair was not too short." The third man was taller and slender and dark skinned. Smith made no notes of what she told him, and he instructed her to wait and give the information to Deputy Sheriff Garris and the other officers when they arrived.

William S. Slaughter, Special Agent of the SBI and Deputy Sheriff Garris arrived at the store about 9:43 p.m. The body had been removed. They found Deputies Smith and Pelletier and Mrs. Barwick there. As Slaughter entered the store he saw a six-pack of Miller High Life beer in a paper bag on the left counter. He also observed two one dollar bills and a quarter on the opposite side of the counter, the right side. On the counter back of the cash register he found an opened pack of Kool cigarettes.

Slaughter's testimony as to what Mrs. Barwick (whom he described as "very upset") told him had occurred follows:

"She stated that at approximately 8:15 two black males entered the store; that one black male went to the rear of the store and another one went to the beer cooler; that the one at the beer cooler obtained a six pack of Miller High Life bottled beer and brought it back to the counter and he was paying for it or had four $1.00 bills in his hand and she was attempting to put a bag over the beer when she heard a loud noise; that

one of the Negro males grabbed her and held her and she heard the one in the back of the store going to the front of the store."

At this point the record discloses the following:

"Mr. Spence [attorney for Joseph Foster] : Request instructions, your Honor. No Ruling. The defendants each object and except to the Court's failure to rule. Exception No. 540."

Mr. Slaughter then continued his account of what Mrs. Barwick had told him. She had said that while one was holding her a third Negro male entered the store. The first one who went to the back of the store was in his early twenties, about five feet, six to eight inches tall, "medium but muscular built," dark complexion, round facial features, wearing dark clothes, hair cut "about a three-inch Afro." However, on cross-examination, Slaughter said that term was his; that Mrs. Barwick hadn't said "Afro." When he asked her to estimate the length of the hair "she held her fingers at approximately this height" (witness demonstrated with two fingers). She told Slaughter that the second individual was also in his early twenties, about the same height and build, dark complexion, and had "a medium Afro." He wore dark clothes, a pullover sweater or shirt with buttons down the front. The third individual was described as tall and heavier built. He had a lighter complexion and was wearing a yellow toboggan with green stripes around it and a waist-length jacket.

According to Slaughter the approximate height of Joseph Foster is five foot, seven and a half inches tall and his complexion is dark. His approximate weight is 135-140 pounds. Tharoy Davis is approximately five feet, ten or eleven inches tall, and his complexion is medium to dark.

In the course of his examination of the premises Slaughter photographed the inside of the building and did "latent lift work," which is an attempt to recover latent fingerprints. He recovered prints from the carton of beer on the counter and the beer cooler. He was unable to get any from the cash register, the counter, or the package of Kools. His search of the premises revealed four firearms in the store—two .22 caliber rifles in the corner of the bedroom, a .22 caliber pistol underneath the mattress, and a .22 caliber pistol underneath the counter below the cash register. In Grant's truck in the store yard he found a gun or rifle. He also found a pistol in Mrs. Barwick's car and a .22 caliber, semi-automatic rifle at her home.

State v. Davis

On the morning of December 29th Agents Slaughter and Bailey watched Dr. Nye and Dr. Hillman perform the autopsy upon the body of Sparky Grant. Bailey testified that, upon examining the wound he concluded it was inflicted by a .38 caliber bullet. Dr. Nye pointed out to them the path of the bullet, and they observed that the exit wound was in the top of the head. Acting upon this information he and Slaughter returned to the store to search for the projectile which killed Grant. Once there Slaughter started looking for the bullet. In consequence, he found a .38 caliber bullet hole on the 7th window and then found the bullet. A thorough search of the floor area of the store revealed no cartridge casings.

On January 3, 1974, Slaughter and Bailey acquired from Mrs. Barwick the purple blouse she was wearing on the night of December 28th. Bailey took it, the latent fingerprints and firearms from the store and also those belonging to Mrs. Barwick to the SBI Laboratory in Raleigh. There F. M. Hearst, Jr., an expert in firearms and toolmark identification, examined the .38 caliber bullet taken from the window casing and concluded that it could not have been fired by any of the six weapons Slaughter had collected. Mr. Glenn Glesne, an expert laboratory analyst in the field of chemistry, blood and body fluids, analyzed the purple blouse which Mrs. Barwick was wearing the night of the homicide and obtained negative results for blood and gunpowder particles.

Stephen R. Jones, an expert in the identification of fingerprints, testified that he got fingerprints from the deceased, Sparky Grant, Mrs. Barwick, and defendants Davis and Foster. He examined the eight latent fingerprints submitted to the SBI Laboratory by Agents Slaughter and Bailey. He was able to identify two of them as the prints of Mrs. Barwick from the carton of Miller High Life beer and two as the prints of Grant from the package of Kools. The other four lacked sufficient characteristics to make any identification whatever.

Dr. S. W. Nye, an expert pathologist, testified that for the bullet which killed Grant to have left such powder burns on his face, it was "fired at a distance of greater than 12 inches and perhaps less than 24 inches." In his opinion it was a .32 caliber or larger. It could have been a .38 caliber. He did not believe it was as small as a .22 caliber.

At the close of the State's evidence each defendant moved to dismiss the charges against him for insufficient proof and renewed his motion to strike the testimony of Mrs. Barwick. The motions were denied and defendants offered evidence.

The testimony of defendant Tharoy Davis, except when quoted, is summarized below:

He is 19 years old and a native of Goldsboro. Having dropped out of school in the twelfth grade, he joined the Army in September 1973. Immediately after he finished his basic training he purchased a 1967 white Mustang. In December 1973 his hair was short—"not even an inch long"—, and he had no beard.

Tharoy has never seen, or been in Sparky Grant's store. He never saw Sparky, and he had never seen Mrs. Barwick prior to the preliminary hearing in this case. He did not go into Grant's grocery on either Thursday or Friday, December 27th or 28th. Neither he nor anyone in his car had a gun on either of those days, and he was not present on any occasion during the 1973 Christmas holidays when a store was robbed or a storekeeper shot.

He came to his mother's home in Goldsboro on 18 December 1973 from Fort Gordon, Georgia, where he was stationed. His cousin, Joseph Foster, who also lived with his mother, arrived on December 19th from Fort Dix, New Jersey.

About 2:30 p.m. on the Thursday after Christmas, Tharoy and Joseph, riding in Tharoy's white Mustang, picked up John D. and Juney Boy Hodges, both of whom had been drinking. John D. requested Tharoy to take him to see his father, Jack Foster. After a stop in Goldsboro to purchase a jack for Tharoy's tape recorder, the four drove to Jack Foster's home in Lenoir County. Jack was not there so they went to James Kornegay's house, where everybody played basketball until "dusk dark" except Tharoy "and the Kornegay dude,"who kept shooting by the porch light. When they left, being thirsty from playing basketball, the group drove to Rock Newman's store. "There is not a big oak tree near that store." Tharoy had only twelve cents; so he asked Joseph to buy him a soda.

From Newman's store they went to the home of John Smith to see his daughter Catherine, who was a cousin of Joseph and John D. Foster. After about an hour and forty-five minutes

State v. Davis

with the Smiths, about 8:00 p.m., the four returned to the home of Jack Foster. They found him sorting scraps from some hogs he had killed. They stayed at Jack Foster's "a good two hours or two and a half hours more." John D. and Joseph helped their father chop some wood, and Tharoy promised to take Jack and his wife to Farmville on Saturday. At 10:30 p.m. they left and returned to Goldsboro without making any stops. They "dropped John D. and Juney Boy off at Central Heights," where they lived, and at 11:00 p.m. they returned to the home of Tharoy's mother, who was waiting up for them.

The following morning, Friday, December 28th, Tharoy and Joe slept until 11:00, when Mrs. Davis fixed breakfast for them. About noon Tharoy and Joseph took the white Mustang to a truck stop at which his brother-in-law, Rufus McColl, worked as a mechanic. With McColl's help he and Joseph put some fog lights and silver dust flaps on Tharoy's car. From there Tharoy and Joseph went to Raeford, where they visited the Campbells, nephews and nieces of his sister. They also went to the home of Mabel Bullock, where they stayed until 11:00 p.m. before returning to Goldsboro.

According to arrangements he had made with Jack Foster on Thursday Tharoy went with Joseph to Jack's home on Saturday and drove Jack and his wife to Farmville. He returned them to their home about 4:30 p.m., and he and Joe then drove back to Goldsboro without stopping. He remained in Goldsboro until 5 January 1974, when his leave was up.

In response to a phone call from his mother he came back to Goldsboro the following week and "learned that someone named Bob Garris was looking for him for doing something that he hadn't done." He called Mr. Garris and inquired what he wanted with him. He was told they just wanted to ask him a few questions, and he talked with Garris and Slaughter in Goldsboro. He "was not afraid right then because he knew he hadn't done anything. He later did become afraid." With reference to their questions Tharoy testified: "I told them I was at Jack Foster's house on Friday, December 28th. That statement is true in a way and false in a way. . . . I told them that I was at Jack Foster's house but I didn't tell them that I was there on the 28th. . . . I didn't mean the 28th, I told him that I came there but not on the 28th."

With reference to John D.'s testimony, that after they left the home of Jack Foster they stopped at a store which had a big oak tree in the yard, Tharoy said, "John D. must have been talking about Mr. Rock Newman's store when he referred to a big tree." However, he also said, "There is not a big oak tree near that store." With reference to Jack Foster's testimony that the defendants left his home about 8:00 p.m. on Friday, December 28th, and that Tharoy took him to Farmville on the following day, Saturday, the 29th, Tharoy said that Jack Foster is an alcoholic who was drunk when he took him to Farmville and that "he is telling a story on me." With reference to the testimony of Lou Kornegay he said that she probably deliberately lied on him; that she didn't like him "no way." He said that he failed to tell the officers that he went to Raeford on December 28th because he couldn't think; that this was his first time in trouble and he was confused; that he did not know what was going on.

Mabel Bullock, called as a witness by defendant Davis, testified that Tharoy and Joseph came to her home in Raeford to see her daughter Patricia about 8:00 p.m. on 28 December 1973; that neither had long hair nor an Afro. She was in their presence for about an hour, and they left sometime between 9:00 and 10:00. She had never seen either one before that night. They were both well mannered and behaved during the time they were in her home.

Rufus McColl, called as a witness by defendant Davis, testified that he is married to Tharoy's sister. On the Friday after Christmas, December 28, 1973, Tharoy and Joseph came to the 117 truck stop in Goldsboro, where he then worked, to borrow an electric drill from him. He lent them the drill and showed them how to put fog lights on Tharoy's white Mustang and how to adjust his muffler. When he left the truck stop premises at 2:00 p.m. Tharoy and Joseph Foster were still there. That night about 8:00 he saw John D. Foster and Juney Boy Hodges in Central Heights.

Defendant Foster's evidence consisted of the testimony of Jacqueline Terresa Jackson. In substance she said that on Friday, 28 December 1973, she went from Charlotte to the home of Mabel Bullock in Raeford, arriving there about 5:00 p.m.; that about 7:30 p.m. she and Patricia Bullock encountered Joseph Foster at a neighborhod store. He offered to take them

"down the street because he was going that way." He took them two doors past Patricia Bullock's house to the home of Patricia Campbell, where he had left Tharoy. He and Tharoy came back at 8:00, and they sat around in the dining room and talked until 9:30, when Joseph, Tharoy, and the two Patricias went across the street to a club until 11:30. At that time Tharoy and Joseph left the club. The two Patricias remained there until about midnight.

At the close of all the evidence each defendant renewed his motion for a judgment of nonsuit and to suppress the testimony of Edna Barwick. These motions were denied.

Judge Lanier submitted to the jury the question of each defendant's guilt of armed robbery or common law robbery and of murder in the first degree. With reference to the indictments for murder the judge charged the jurors that if they were satisfied beyond a reasonable doubt that either Tharoy Davis or Joseph Foster shot and killed George A. Grant while they were committing, or attempting to commit a robbery each would be guilty of murder in the first degree.

After deliberating an hour and a half the jury found each defendant guilty of common law robbery and murder in the first degree.

*Rufus Edmisten, Attorney General, and Lester V. Chalmers, Assistant Attorney General, for the State.*

*John E. Duke for Tharoy Davis, defendant appellant.*

*William D. Spence for Joseph C. Foster, defendant appellant.*

SHARP, Chief Justice.

In the record on appeal defendant Foster lists 103 assignments of error. Of these he brings forward 19, setting them out in his brief in the manner required by Rule 28, Rules of Practice in the Supreme Court, N.C.G.S. Vol. 4A, Append. I (1970). Defendant Davis lists 104 assignments, all except No. 104, being identical in number and content with those of Foster. Davis has attempted to bring forward all but three of his assignments. In general disregard of Rule 28, Rules of Practice in the Supreme Court, he has attempted to correlate all 101 of them within seven groups. He essayed an impossible task—as would

we were we to undertake to accommodate this opinion to any such categorization. Our consideration of the record and briefs, however, reveals that relatively few require consideration. In the beginning, we dispose of the 12 assignments (abandoned by Foster) which Davis marshals in his Groups I and II.

Group I assignments, all but one of which involve pretrial motions, are that the court erred (A) in refusing to quash the bill of indictment; (B) in refusing to allow defendants' motion for discovery "in its entirety"; (C) in hearing defendants' discovery motions without the presence of Davis; (D) in failing "to hold a preliminary hearing until after defendant had been in jail several weeks"; (E) "in refusing to dismiss for lack of a speedy trial"; (F) in granting the State's motion to consolidate Davis's trial with that of Foster; and (G) in refusing defendants' motion to sequester the witnesses.

Neither error in the court's rulings on these motions nor prejudice resulting therefrom has been made to appear.

[1]  (A) The bill of indictment was drawn in the words of G.S. 15-144. It was, therefore, sufficient to support a conviction of murder in the first degree. *State v. Frazier*, 280 N.C. 181, 185 S.E. 2d 652 (1972), *modified*, 283 N.C. 99, 195 S.E. 2d 33 (1973).

[2]  (B) The court's order upon defendants' motions for discovery entered under the then applicable statute, G.S. 15-155.4 (N.C.G.S. Vol. 1C, Cum. Supp. 1974) (repealed by 1973 N. C. Sess. Laws c. 1286, § 26) made available to them all information to which they were entitled. Had the court allowed either of the defendants' motions "in its entirety" he would have had to require every law enforcement officer who worked on this case to compile a daily log of his activities throughout his investigation and the State to surrender, without discrimination, its entire work product. For instance, Davis demanded "any and all statements made by any persons to the investigating officers"; and Foster demanded "a list of the names and addresses of all persons interviewed by agents of the State which the State [did] not intend to produce as witnesses at the time of trial, and the specific reasons why the State [would] not call said witnesses." A defendant is not entitled to the granting of a "motion for a fishing expedition nor to receive the work product of police or State investigators." *State v. Davis*, 282 N.C.

---

State v. Davis

---

107, 111-12, 191 S.E. 2d 664, 667 (1972). *See State v. Gaines,* 283 N.C. 33, 194 S.E. 2d 839 (1973) ; *State v. Peele,* 281 N.C. 253, 188 S.E. 2d 326 (1972).

**[3]** (C) The record discloses that the order entered upon defendant Foster's motion for discovery was made applicable to Davis by consent of his counsel. Further, the following statement appears in Davis's brief: "Although defendant's attorney admittedly made no request that the defendant be allowed to be present at the hearing before Judge Browning . . . it is submitted that the Court erred in not requiring the defendant's physical presence." Not so. The strict rule that an accused cannot waive his right to be present at every stage of his *trial* upon an indictment charging a capital felony, *State v. Moore,* 275 N.C. 198, 166 S.E. 2d 652 (1969), is not extended to require his presence at the hearing of a pretrial motion for discovery when he is represented by counsel who consented to his absence, and when no prejudice resulted from his absence. *See Brown v. State,* 225 Md. 349, 170 A. 2d 300 (1960) ; Annot., "Presence at Trial—Law Argument," 85 A.L.R. 2d 1111 (1962).

**[4]** (D)-(E). The record reveals Davis was arrested on 2 February 1974 and between then and February 12th (exact date undisclosed) his parents employed Mr. John E. Duke to represent him. As privately employed counsel, Mr. Duke represented Davis at his preliminary hearing on March 7th and at his trial during the week of June 10th. After Davis's conviction and upon his affidavit of indigency, on June 16th the court appointed Mr. Duke to represent him on appeal to this Court. Defendant Foster was arrested on 4 February 1974, and, on 6 February 1974, Mr. William D. Spence, his present counsel, who has represented him throughout, was appointed as his attorney. The record discloses no request or demand by either defendant for a preliminary hearing earlier than March 7th nor for a trial before June 10th. Further, it is not suggested that the State purposely delayed defendants' trial or that any prejudice resulted to either defendant by reason of any delay in the proceedings. *See State v. Spencer,* 281 N.C. 121, 187 S.E. 2d 779 (1972). *State v. Ball,* 277 N.C. 714, 178 S.E. 2d 377 (1971) ; *State v. Johnson,* 275 N.C. 264, 167 S.E. 2d 274 (1969) ; *State v. Hollars,* 266 N.C. 45, 145 S.E. 2d 309 (1965).

**[5]** (F). The State's motion to consolidate the trial of the two defendants was addressed to the sound discretion of the presiding judge, and there is no basis for a contention that he abused

his discretion. "Ordinarily, consolidation is appropriate when the offenses charged are of the same class and are so connected in time and place that evidence at the trial upon one of the indictments would be competent and admissible at the trial on the other(s)." *State v. McVay* and *State v. Simmons,* 277 N.C. 410, 414, 177 S.E. 2d 874, 876 (1970). Obviously this is such a case.

[6]   (G). The sequestration of witnesses is likewise a matter in the trial judge's discretion and the record suggests no abuse. *See State v. Clayton,* 272 N.C. 377, 385-86, 158 S.E. 2d 557, 563 (1968).

[7]   Included in Group I is Davis's assignment No. 3, that the court erred in permitting Clarence Jones, Jr., and Deputy Sheriff William E. Smith (witnesses for the State whose names were omitted from the list of potential witnesses furnished defendants prior to trial) to testify. It is apparent from the record that the omission of the names of these two witnesses neither deprived defendants of a fair trial nor resulted in any prejudice to them. The testimony of Clarence Jones in no way implicated either defendant in the robbery and murder at Grant's grocery. Deputy Sheriffs Smith, Garris, and Pelletier, and SBI Agent Slaughter were the officers who made the preliminary investigation at the store on the night of the homicide. Smith was called as a witness to substitute for Pelletier, whose name was on the list but who had become unable to testify during the trial. Bad faith on the part of the State in omitting the names of Jones and Smith is not indicated. Permitting these witnesses to testify was a matter within the discretion of the trial judge, not reviewable in the absence of a showing of an abuse of discretion. *State v. Carter,* 289 N.C. 35, 220 S.E. 2d 313 (1975). None has been shown. This misplaced assignment is without merit and is also overruled.

[8]   Defendant Davis's Group II assignment of errors challenge the court's ruling allowing the State to challenge four jurors for cause. One stated unequivocally that his mind was "made up" with reference to defendants' guilt or innocence. As we interpret the answers of the other three challenged jurors to questions put to them by the solicitor on *voir dire,* each stated without equivocation that his opposition to capital punishment was such that he would refuse to return a verdict of guilty of murder in the first degree even though the evidence satisfied

him beyond a reasonable doubt of defendants' guilt. The four challenges were properly allowed. *See State v. Britt,* 288 N.C. 699, 220 S.E. 2d 283 (1975); *State v. Bernard,* 288 N.C. 321, 218 S.E. 2d 327 (1975); *State v. Monk,* 286 N.C. 509, 212 S.E. 2d 125 (1975); *State v. Noell,* 284 N.C. 670, 202 S.E. 2d 750 (1974). *See also State v. Smith,* 290 N.C. 148, 226 S.E. 2d 10 (1976).

[9] Assignment No. 77 is that the judge erred in overruling defendants' motions of nonsuit. The State's evidence, which we have taken pains to set out in considerable detail in the preliminary statement, was clearly sufficient to withstand these motions. Measured by the applicable and oft-stated rule *(see State v. Walker,* 266 N.C. 269, 145 S.E. 2d 833 (1966)), the testimony of the following witnesses sufficed to take the case to the jury on the question of defendants' guilt of the felony murder for which they were convicted: (1) Mrs. Barwick's identification of defendants as two of the three men who were in Grant's store on the occasion of the robbery and homicide and her chronology of the events occurring while they were in the store, which tended to implicate all three in the robbery; (2) Lucinda Carol Kornegay's testimony tending to show that on Friday, 28 December 1973, from noon until 5:00 p.m. the defendants, John D. Foster, and Hodges were together at her home, five miles from Sparky Grant's store; (3) Jack Foster's testimony that defendants, John D. Foster, and Hodges left his home, located four and one-half miles from the store, about 8:00 p.m. on 28 December 1973; and (4) the testimony of John D. Foster that, after he, defendants, and Hodges left Jack Foster's home about 8:00 p.m. on the day they got a jack for Tharoy's tape recorder and thereafter played basketball at Lou Kornegay's house, they stopped at a store with a tree and a gas tank in the yard; that Tharoy and Joe Foster went into the store and "a couple of minutes later" Hodges went in leaving him alone in the car; that in two or three minutes thereafter the three came back and Tharoy drove straight to Goldsboro.

Defendants' evidence, which tended to show that on 28 December 1973 at the time of the robbery and homicide in question they were in Raeford and that John D. Foster and Hodges were in Central Heights, was inconsistent with the State's evidence. It was therefore not for consideration in passing upon the motion for nonsuit. *See* 2 Strong's N. C. Index 2d *Criminal Law* § 104 (1967).

The State's case was largely dependent upon Mrs. Barwick's identification of defendants. In assignment No. 18 defendants assert that the trial judge erred in permitting Mrs. Barwick to testify that defendants were two of the three people who were in the store on the occasion when she was robbed and Grant was killed. By this assignment they raise the crucial question in the case.

Specifically defendants contend: (1) On the *voir dire* to determine the competency of Mrs. Barwick's in-court identification of defendants, the court permitted the solicitor to ask such leading questions that he became the witness and supplied the answers which the State needed to prove its case. (2) Mrs. Barwick's testimony disclosed her observations of the men who were in the store to have been totally inadequate to form the basis for the identification of any person. (3) Her in-court identification of defendants was the result of the "impermissibly suggestive pretrial photographic identification procedues" employed by the investigating officers, and the judge's findings to the contrary, made at the conclusion of the *voir dire,* are not supported by the evidence. (4) The judge's findings of fact on *voir dire* were influenced by the incompetent testimony of Deputy Sheriff Garris that Hodges told him he was in the automobile outside Grant's store when he heard a shot whereupon he ran inside where he saw Davis, gun in hand, holding a white lady while Foster was getting the money from the cash register.

We discuss the foregoing contentions seriatim.

[10]  (1) Our examination of the record reveals no extensive or prejudicial leading of the witness Barwick by the solicitor on *voir dire*. On the contrary, it shows that he was unable to overcome Mrs. Barwick's determination "to tell it" in her own way and not to overstate her observations at the time, and that she successfully resisted all attempts by the solicitor to lead her. However, "it is firmly entrenched in the law of this State that it is within the sound discretion of the trial judge to determine whether counsel shall be permitted to ask leading questions, and in the absence of abuse the exercise of such discretion will not be disturbed on appeal." *State v. Greene,* 285 N.C. 482, 492, 206 S.E. 2d 229, 235 (1974). *See State v. Painter,* 265 N.C. 277, 144 S.E. 2d 6 (1965) ; 1 Stansbury's N. C. Evidence § 31 (Brandis Rev., 1973). Defendants' assignments charging prejudice from the solicitor's leading questions are overruled.

[11] (2)-(3) In the record we find no evidence which would support a finding that Mrs. Barwick's photographic identification of defendants was the result of "impermissible suggestiveness" or resulted from procedures creating a substantial likelihood of irreparable misidentification. *See Simmons v. United States,* 390 U.S. 377, 19 L.Ed. 2d 1247, 88 S.Ct. 967 (1968) ; *State v. Cross,* 284 N.C. 174, 200 S.E. 2d 27 (1973) ; *State v. Knight,* 282 N.C. 220, 192 S.E. 2d 283 (1972). All the evidence tends to show: On different occasions between 28 December 1973 and 15 February 1974 Officers Slaughter and Garris showed Mrs. Barwick at least 60 black and white photographs of black males. She identified none of the pictures as being photographs of the men she saw in the store on the night of 28 December 1973, although on three occasions a photograph of each defendant taken from his high school annual was among those shown her. On 15 February 1974, however, the officers handed her two folders, State's Exhibits 8 and 9, and asked her to "see if she could identify anybody on these." Nothing further was said. *See State v. McNeil,* 277 N.C. 162, 172, 176 S.E. 2d 732, 737-38 (1970), *cert. denied,* 401 U.S. 962, 28 L.Ed. 2d 245, 91 S.Ct. 967 (1971). Exhibit 8 contained a colored photograph of Davis in a "line-up" of seven colored photographs; Exhibit 9 contained Foster's picture in a similar line-up of colored photographs. Mrs. Barwick looked "a couple of minutes" and then pointed to the Davis picture in Exhibit 8 and to Foster's in Exhibit 9 and said, "This one and that one." At the officer's request she put her initials and the date, "2-15-74," under each picture. Prior to that time Mrs. Barwick had made no identification, either from photographs or a police line-up of individuals. She had, however, told the officers that several of the photographs, and one man in the line-up resembled one of the men she saw in the store at the time of the robbery.

Mrs. Barwick knew that two suspects had been arrested and were in jail on 15 February 1974, but she had seen no pictures of them and did not know their names. On this occasion she asked the officers no questions because (she said) on previous occasions when she had inquired of them "if they had any clues or anything" they had always responded that they could tell her nothing. However, several minutes *after* she had initialed and dated the pictures she asked the officers if "they" were "the men." The officer told her they could make no comment on her identification and left.

At this state of the proceedings Mrs. Barwick's inquiry whether the pictures she had identified were "the men" would seem to evidence only a natural curiosity to know if the men on whom she "had put the finger" were the men the officers had arrested.

We have carefully examined all the photographs and albums which the officers exhibited to Mrs. Barwick and, like the trial judge, we attach no significance to the fact that on three occasions she failed to identify high school pictures of the two defendants among the 60 black and white photographs submitted to her. In our view, the boyish photographs taken from high school annuals, "three or four years old" on 28 December 1973, bear no identifiable resemblance to the colored pictures of defendants taken on the second or third day of February 1974—less than 40 days after the homicide. In the intervening three or four years between high school and 28 December 1973 defendants had become men and members of the armed forces. However, it is not without significance that when Mrs. Barwick was shown current photographs of defendants she quickly picked *both* from a collection of 14 pictures of men of comparable age, size, and color as the persons she saw in the store on the occasion of the robbery. When asked to explain how she recognized the defendants when she saw their pictures in Exhibits 8 and 9 she said, "I don't know how I was able to know it, I just did. Like I would know anybody else I had really seen. I don't know, I just knew it when I saw the pictures."

Defendants argue strenuously that Mrs. Barwick's observations of the men who came in the store on the night of the robbery and homicide were only casual glimpses, patently insufficient to form the basis of a reliable identification. They have construed the literalness and caution in Mrs. Barwick's testimony, not as evidence of a fixed purpose not to deviate in the most minute detail from the facts as they were impressed upon her mind at the time, but as manifesting an ultimate uncertainty of her identifications. The record does not support such a conclusion. Mrs. Barwick's testimony indicates that when she registered a mental picture she said so; when she didn't she said so. See *State v. McNeil, supra.* Indubitably she had ample opportunity to observe the man who took the beer from the cooler and brought it to the counter where she stood. She said she thought she got a mental picture of him during these two

procedures, and she identified him as defendant Tharoy Davis. In answer to the solicitor's question whether she was positive that "Tharoy Davis was in Sparky Grant's grocery store on the night of December 28, 1973 purchasing beer at the time of the gun shot," she said, "I am sure it was him."

The mental picture she said she got of the man she identified as defendant Joseph Foster was obtained when, after she had heard two others leave, she saw him standing six feet from her at the front door, trying to pull over his head a yellowish toboggan with a green and red stripe around it. She described his wearing apparel as khaki pants and a faded blue jean coat. Prima facie, she did get a mental picture of the man standing there. When the solicitor asked her if she was positive that defendant, "Joseph Foster, was in Sparky Grant's grocery near the door very shortly after the gunshot on the night in question," she replied, "I am sure."

Defendants also contend that upon cross-examination on the *voir dire* and at the trial Mrs. Barwick invalidated her identification of Davis as one of the men who entered the store on 28 December 1973 when she said State's Exhibit S-2-1, a black and white photograph which was not a picture of Davis, bore such a striking resemblance to one of the individuals she saw that night that it could have been he. At the time she gave this testimony on *voir dire* she pointed to Davis and said, "It looks like that one over there to me . . . I'm talking about the one at the end with the white coat and blue shirt." On cross-examination before the jury she adhered to her opinion that Exhibit S-2-1 could have been the man she saw go to the beer cooler "because it looks like the Davis boy to me. I know now that this is not his photograph. What I am saying is that the picture resembles this fellow over there."

In our view S-2-1 does indeed resemble the color photograph of Davis, and—presumably—the judge and the jury, who saw both the photograph and Davis, agreed with Mrs. Barwick that it did. In any event, this comparison was just one of the facets of the entire evidence, all of which was for consideration of the judge on *voir dire* and the jury at the trial.

Finally, defendants assert that the trial judge's findings on *voir dire* and his conclusion that Mrs. Barwick's in-court identification of defendants was admissible was "tainted" by the incompetent testimony of Deputy Sheriff Garris that Hodges

told him he and defendants were at Grant's store on the night of the robbery-homicide; that after hearing a shot he ran inside and saw Davis, gun in hand, holding a white woman while Foster emptied the cash register. Defendants contend that without the assurance of this hearsay evidence Judge Lanier would not have found Mrs. Barwick's observations a sufficient basis for her identification.

[12]    Garris's challenged testimony is, of course, a classic example of inadmissible hearsay, and it was clearly incompetent. Defendants' objections should have been sustained. Decisions of this Court recognize, however, that in a "hearing before the judge on a preliminary motion, the ordinary rules as to the competency of evidence applied in a trial before a jury are to some extent relaxed, for the reason that the judge with knowledge of the law is able to eliminate from the testimony he hears that which is immaterial and incompetent, and consider only that which tends properly to prove the facts to be found." *Cameron v. Cameron*, 232 N.C. 686, 690, 61 S.E. 2d 913, 915 (1950). *See Mayberry v. Insurance Co.*, 264 N.C. 658, 142 S.E. 2d 626 (1965); *Reid v. Johnston*, 241 N.C. 201, 85 S.E. 2d 114 (1954); 1 Stansbury's N. C. Evidence § 4a (Brandis rev. 1973). The rule enumerated in these decisions is also the rule in the federal courts.

In *United States v. Matlock*, 415 U.S. 164, 39 L.Ed. 2d 242, 94 S.Ct. 988 (1974), the Supreme Court said, ". . . the rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence. . . .

"That the same rules of evidence governing criminal jury trials are not generally thought to govern hearings before a judge to determine evidentiary questions was confirmed on November 20 last year [1973] when the Court transmitted to Congress the proposed Federal Rules of Evidence [Rules 104(a) and 1101(d)(1)]. . . . The rules in this respect reflect the general views of various authorities on evidence. 5 J. Wigmore, Evidence § 1385 (3d ed. 1940); C. McCormick, Evidence § 53, p. 122, n. 91 (2d ed. 1972). *See also* Maguire & Epstein, Rules of Evidence in Preliminary Controversies as to Admissibility, 36 Yale L.J. 1101 (1927)." *Id.* at 172-74, 39 L.Ed. 2d at 250-51, 94 S.Ct. at 994-95.

Seemingly, Judge Lanier in the trial below interpreted the quoted statement from *Cameron v. Cameron, supra,* to mean that upon a *voir dire* or other preliminary judicial inquiry every rule of evidence is suspended. Such an interpretation is not in accord with the law of this State. While our reports abound with decisions in which the rules were relaxed, this Court has never subscribed to Professor Wigmore's premise that, "In *preliminary rulings* by a judge on the admissibility of evidence, the ordinary rules of evidence do not apply. . . ." 3 J. Wigmore, Evidence § 1385 (2d ed. 1923). *See also* 5 J. Wigmore, Evidence § 1385 (Chadbourn rev. 1974). Indeed, as stated by Maguire and Epstein in an article discussing the Wigmore *proposition,* "Nothing is clearer than that a trial judge in any jurisdiction will be reversed for lack of enough material and competent evidence to support his finding, no matter how much inadmissible evidence there was in his favor. That is to say, if the judge stands convicted beyond a reasonable doubt of having decided on the basis of improper evidence neither Greenleaf nor Wigmore nor Willes has power to absolve him." Rules of Evidence in Preliminary Controversies as to Admissibility, 36 Yale L.J. 1101, 1116-17 (1927). *See also* C. McCormick, Evidence §§ 53, 60 (2d ed. 1972).

Unquestionably it is the rule in this jurisdiction that a judge's findings of fact will be reversed where it affirmatively appears they are based in whole or in part upon incompetent evidence. *Hicks v. Hicks,* 271 N.C. 204, 155 S.E. 2d 799 (1967); *Mayberry v. Insurance Co., supra; Bizzell v. Bizzell,* 247 N.C. 590, 101 S.E. 2d 668 (1958); *Reid v. Johnston, supra.* The safe practice, therefore, is for the trial judges to adhere to the rules of evidence. However, " 'in the absence of words or conduct indicating otherwise, the presumption is that the judge disregarded incompetent evidence in making his decision.' (Cite omitted.) And the court's finding of fact will not be reversed unless based only on incompetent evidence. (Cites omitted.) If the findings are supported by competent evidence, they are binding on this Court even though there is evidence to the contrary." *Cogdill v. Highway Comm.* and *Westfeldt v. Highway Comm.,* 279 N.C. 313, 319-20, 182 S.E. 2d 373, 377 (1971); *Mayberry v. Insurance Co., supra;* 1 Stansbury's N. C. Evidence § 4a (Brandis rev. 1973).

In the absence of affirmative evidence to the contrary, we shall continue to indulge the presumption that judges learned

in the law have based their findings upon competent evidence. However, we take this occasion to point out that this presumption is weakened when, over objection, the judge admits clearly incompetent evidence. "[S]o far as we continue the rules we ought to live up to their spirit." 36 Yale L.J., *supra* at n. 5, 1102. We also note another fact which is not without significance in the administration of justice; the objecting party against whom incompetent evidence has been admitted will rarely share the appellate court's faith that the trial judge, in finding the facts, was governed by correct rules of law. He and his counsel will be prepared to agree with the commentator who remarked, "Nature does not furnish a jurist's brain with thought-tight compartments to suit the convenience of legal theory, and convincing evidence once heard *does* leave its mark." 36 Yale L.J., *supra* at 1115. The defendant and his attorney can also be counted on to distrust the following assertion of the trial judge who preferred not to contend with the rules of evidence: " '[T]his Court, after 35 years, can skim the cream off and let the whey and clabber go to the pigs.' " *General Metals v. Manufacturing Co.,* 259 N.C. 709, 712, 131 S.E. 2d 360, 362 (1963). Suffice it to say that adherence to the rudimentary rules of evidence is desirable even in preliminary *voir dire* hearings. Such adherence invites confidence in the trial judge's findings.

[13] In this case, Mrs. Barwick's testimony that defendants were the men she saw in the store on the night of 28 December 1973 was competent and sufficient evidence, unaided by the Garris hearsay, to sustain the court's findings that her identification of defendants "was based on her independent observations at the time and scene of the robbery and homicide and was not influenced or tainted by other identification acts or procedures prior to the calling of the case for trial." Since defendants offered no evidence on *voir dire* and the testimony of the State's witnesses was uncontradicted the court's findings of fact meet minimum requirements. However, as we have heretofore pointed out in a number of cases, they do not conform to the better practice. *State v. Covington,* 290 N.C. 313, 226 S.E. 2d 629 (1976).

Here we note that the jurors, who did not hear the incompetent testimony which Officer Garris gave on *voir dire,* found Mrs. Barwick's testimony creditable and accepted her identification of defendants after hearing defendants' evidence tend-

ing to establish an alibi and Davis's specific denial that he had ever been in Grant's grocery or participated in robbing Mrs. Barwick. Mrs. Barwick's identification of Davis was positive, and it is a fair inference from all the evidence that, if Davis was in the store and a participant in the robbery, defendant Foster and his brother, John D. Foster, were also participants. Obviously the jury found it significant, and not mere coincidence, that Mrs. Barwick, who had previously declined to identify any person, on 15 February 1974 identified *both* defendants in a photographic line-up when, for the first time, she saw recent pictures of them.

The court's conclusions of fact on *voir dire* are supported by plenary, competent evidence, which is also uncontradicted. They are, therefore, conclusive on appeal. *State v. Tuggle,* 284 N.C. 515, 201 S.E. 2d 884 (1974) ; *State v. Cross,* 284 N.C. 174, 200 S.E. 2d 27 (1973) ; *State v. McVay* and *State v. Simmons,* 277 N.C. 410, 177 S.E. 2d 874 (1970) ; *Morse v. Curtis,* 276 N.C. 371, 172 S.E. 2d 495 (1970). *See State v. Stepney,* 280 N.C. 306, 185 S.E. 2d 844 (1972) ; *State v. Williams,* 274 N.C. 328, 163 S.E. 2d 353 (1968). Defendants' assignment No. 18 is overruled.

[14] Defendant Davis, *who testified in his own behalf,* assigns as error, assignment No. 81, the action of the judge in interrupting his charge to address the following inquiry to counsel for defendant Foster, "Mr. Spence, do you want me to charge on your client's decision not to testify?" Mr. Spence replied that he did. Whereupon, Judge Lanier instructed the jury that defendant Joseph C. Foster had the election to testify or not as he saw fit and that his failure to testify "shall not create any presumption against him." Davis's assignment No. 82 is that, to this instruction, Judge Lanier failed to add, "Therefore, his silence is not to influence your decision in any way." Although not the subject of an assignment of error, Davis now contends that it was also prejudicial error for the court not to charge that Foster's failure to testify should not be considered against Davis.

We disapprove the manner in which the judge handled the failure of Foster to testify. This Court has emphasized and reemphasized that it is better for the court "to give *no instruction* concerning the failure of defendant to testify unless he requests it. . . ." *State v. Bryant,* 283 N.C. 227, 234, 195 S.E.

2d 509, 513 (1973), and cases cited therein. In this case, defendant Foster had made no such request, and for the court to have broached the matter in the presence of the jury by an interruption of his charge was indeed a breach of technique. However, counsel for Foster obviously thought the judge's instruction had taken care of the matter for, in his discriminating selection of the assignments of error which he would press on appeal, he did not bring forward assignment No. 81, and we can perceive no prejudice to Davis from it. Had Davis deemed the judge's question to Mr. Spence inimical to him, an immediate request that the court give the instructions, which he now contends it was error to omit, would have been appropriate. Here we note that Davis's testimony as a witness for himself was of equal probative value to Foster. Further it was corroborated by a witness offered by Foster. Davis's assignments of error Nos. 81 and 82 are overruled.

In his sixth category defendant Davis, without citation of authority or supporting argument, lists twelve assignments to the charge in addition to the two considered above. Illustrative of these are: "80. The court erred in not giving a complete charge on reasonable doubt. Ex. No. 681 (R. p. 472)" . . . "No. 83. In that the court erred in its charge on circumstantial evidence. Ex. No. 684 (R. p. 473). Defendant Davis feels that the court did not give a complete charge on 'circumstantial evidence' and that the brief charge was erroneous." Of Davis's 14 assignments to the charge Foster brings forward only one, assignment No. 90, which asserts that the court "erred in instructing the jury on 'acting in concert' so as to, in effect, charge the jury that it should convict both defendants if either one is found guilty."

Notwithstanding defendant Davis's failure to comply with well established appellate rules, in view of the sentences involved, we have carefully examined the charge as a whole and with particular reference to each assignment of error. Although the charge falls short of being a model, when it is read as a whole—just as the jury heard it—we find no reason to believe that the jury was misled as to the applicable law. The applicable rule is stated in 7 Strong's N. C. Index 2d *Trial* § 33 (1968) as follows: "A charge will be construed contextually as a whole, and when, so construed, it presents the law of the case in such manner as to leave no reasonable cause to believe the jury was misled or misinformed, an exception thereto will not be sus-

tained, even though the instruction might have been more aptly given in different form."

[15]　The crucial question in this case was the identity of the men who robbed the cash register in Grant's grocery on the night of 28 December 1973. When the charge is construed as a whole we think the jury must have understood the judge to mean that if they were satisfied beyond a reasonable doubt that Davis and Foster were acting together while in the course of or attempt to rob Grant's store, and that either one of them shot and killed Grant both would be guilty of first degree murder, but the issue of the guilt of each defendant was to be considered individually.

The assignments of error included in defendant Davis's Groups IV, V, and VII embrace the assignments which Foster brings forward in his brief under questions VII, VIII-a, XI, XII, and XIII. All challenge the court's rulings upon the admission and exclusion of evidence. After examining each assignment we have concluded that most are without merit and that there is no reasonable possibility that any erroneous admission or exclusion of evidence might have contributed to the convictions. *State v. Hudson,* 281 N.C. 100, 187 S.E. 2d 756 (1972), *cert. denied,* 414 U.S. 1160, 39 L.Ed. 2d 112, 94 S.Ct. 920. *See* 1 Strong's N. C. Index 2d *Appeal and Error* § 49 (1967).

[16]　Both defendants assign as error the action of the court in allowing the jury to be polled by the deputy clerk of the Superior Court of Lenoir County. "In the absence of any statutory provision as to the method of conducting a poll of the jury, the matter is within the discretion of the trial judge. The polling is usually conducted by the trial judge, or by the clerk of the court under the supervision of the judge." 76 Am. Jur. 2d *Trial* § 1122 (1975). In *State v. Boger,* 202 N.C. 702, 163 S.E. 877 (1932), this Court recognized the "right of a defendant in a criminal action tried in a court of this State to have the jurors *polled by the judge or under his direction,* when a request for such poll is made in apt time, after an adverse verdict has been returned by the jurors. . . ." *Id.* at 703, 163 S.E. at 877 (emphasis added). Polling the jury is clearly a ministerial act which, even in a capital case, may be performed by the deputy clerk of court in the presence and under the supervision of the trial judge. Defendants' assignment No. 94 is overruled.

[17] We have considered the entire record in this case as well as each of the defendants' assignments of error with care commensurate with the sentences from which they appealed. Having done so, we find no error which, in our opinion, influenced the verdicts. We therefore affirm the verdicts. However, the motion of each defendant in arrest of judgment upon his conviction of common law robbery must be sustained. Since the robbery was used to prove an essential element of the charge of murder in the first degree for which each was also convicted and sentenced, separate judgments imposing additional punishment for the robbery cannot stand. *See State v. McZorn*, 288 N.C. 417, 219 S.E. 2d 201 (1975) (death sentence vacated 6 July 1976, ____ U.S. ____), cases cited therein, and *State v. Lock*, 284 N.C. 182, 200 S.E. 2d 49 (1973). Assignments of error Nos. 99 and 103 are sustained and the judgments upon defendants' conviction under indictments 74CR1249 and 74CR1103 are arrested.

[18] After the preparation of this opinion, but before it was filed, the Supreme Court of the United States in *Woodson v. North Carolina*, ___ U.S. ___, 96 S.Ct. 2978, 44 L.W. 5267 (1976), a plurality decision filed 2 July 1976, invalidated the death penalty provision of G.S. 14-17 (Cum. Supp. 1975), the statute under which the defendants Woodson and Waxton were convicted of first degree murder and sentenced to death. This statute is the codification of Ch. 1201, N. C. Sess. Laws (1973, 2d Session 1974). Defendants in this case, Davis and Foster, were not sentenced to death under that statute. We must, however, consider the effect of the *Woodson* decision upon the sentence of death imposed upon them.

Davis and Foster were sentenced under G.S. 14-17 (1969) *before* it was rewritten by Ch. 1201 (effective 8 April 1974) and *after* it was interpreted by this Court in *State v. Waddell*, 282 N.C. 431, 194 S.E. 2d 19 (decided 18 January 1973). At that time, in pertinent part, G.S. 14-17 provided:

"A murder . . . which shall be committed in the perpetration or attempt to perpetrate any . . . robbery . . . shall be deemed murder in the first degree and shall be punished with death: Provided, if at the time of rendering its verdict in open court, the jury shall so recommend, the punishment shall be imprisonment for life in the State's prison. . . . "

---

---

In *Waddell* all the members of this Court concurred in the view that the decision of the Supreme Court in *Furman v. Georgia,* 408 U.S. 238, 33 L.Ed. 2d 346, 92 S.Ct. 2726 (1972), held that the Eighth and Fourteenth Amendments prohibit the infliction of the death sentence if the applicable statute permitted either judge or jury to impose that sentence as a matter of discretion, and that, because G.S. 14-17 (1969) gave the jury the "unbridled" discretion to impose either the life or death sentence, no death sentence could be executed under it. In *Waddell* the majority of this Court held that the *Furman* decision invalidated only the proviso of the statute permitting a jury to recommend life imprisonment and that the portion of the statute mandating the death penalty remained intact.

In *Woodson* the Supreme Court noted that the effect of the *Waddell* decision was a statute which "survived as a mandatory death penalty law."____ U.S. at ____, 96 S.Ct. at 2982, 44 L.W. at 5269. Thus it is plain that G.S. 14-17 (1969), as it was interpreted by *Waddell,* is unconstitutional under the rationale of *Woodson,* which, in effect, nullified this Court's holding in *Waddell.* Consequently, we are now in the same legal position relative to the punishment for crimes which were punishable by death under G.S. 14-17 (1969) between, 18 January 1973 and 8 April 1974 as we were in the post-*Furman* and pre-*Waddell* period.

For crimes committed or tried during that period this Court consistently vacated the death sentence and ordered a sentence of life imprisonment imposed in lieu thereof. *See, e.g., State v. Waddell, supra; State v. Frazier,* 283 N.C. 99, 195 S.E. 2d 33 (1973) ; *State v. Chance,* 283 N.C. 102, 194 S.E. 2d 858 (1973) ; *State v. Washington,* 283 N.C. 175, 195 S.E. 2d 534 (1973) ; *State v. Watkins,* 283 N.C. 504, 196 S.E. 2d 750 (1973) ; *State v. Carroll,* 282 N.C. 326, 193 S.E. 2d 85 (1972). Where the trial court imposed a sentence of life imprisonment this Court affirmed the judgment. *State v. Alexander,* 284 N.C. 87, 199 S.E. 2d 450 (1973). In an instance where the death penalty could not be imposed because of *United States v. Jackson,* 390 U.S. 570, 20 L.Ed. 2d 138, 88 S.Ct. 1209 (1968) and *Pope v. United States,* 392 U.S. 651, 20 L.Ed. 2d 1317, 88 S.Ct. 2145 (1968), this Court ruled that life imprisonment was the appropriate judgment, *State v. Childs,* 280 N.C. 576, 187 S.E. 2d 78 (1972).

Both common sense and rudimentary justice demand that the maximum permissible sentence of life imprisonment now be imposed upon a person convicted of first degree murder or rape committed between *Waddell* and the enactment of Ch. 1201 which rewrote G.S. 14-17. This interpretation is bolstered by the General Assembly's enactment of Ch. 1201, § 7, N. C. Sess. Laws (1973, 2d Session 1974), effective 8 April 1974, which specifically provided: "In the event it is determined by the North Carolina Supreme Court or the United States Supreme Court that a sentence of death may not be constitutionally imposed for any capital offense for which the death penalty is provided by this Act, the punishment for the offense shall be life imprisonment." The policy underlying this statute is by analogy as applicable to the invalidation of the mandatory death penalty declared by the *Waddell* interpretation as it is to the invalidation of the mandatory death penalty law enacted by the General Assembly, both of which were invalidated by *Woodson.* This statute manifests the General Assembly's intent to eliminate any possibility that, because of the action of the Supreme Court, the punishment for a crime for which it had mandated the death penalty would be left in limbo between its sessions.

The contention that, with reference to first degree murder (or a rape) committed prior to the 1975 Act, the only permissible punishment is a maximum of ten years' imprisonment under G.S. 14-2 (1969) is unrealistic. It is noted that the punishment for *second* degree murder is now imprisonment for life or a term of years, G.S. 14-17 (Cum. Supp. 1975), and for manslaughter, up to twenty years, G.S. 14-18 (1969). Murder in the first degree is obviously the most serious of the felonious homicides. (Similarly, the punishment for second degree rape is imprisonment for life or a term of years, G.S. 14-21 (Cum. Supp. 1975), and for assault with intent to commit rape, imprisonment up to fifteen years, G.S. 14-22 (1969).)

We hold, therefore, that the punishment for the defendants in this case is life imprisonment. For that reason, each defendant's motion in arrest of the judgment imposing upon him the death penalty must also be allowed. Therefore, the judgment in case No. 74CR1248 imposing the sentence of death upon defendant Foster and the judgment in case No. 74CR1102 imposing the sentence of death upon defendant Davis are vacated, and sentences of life imprisonment substituted in lieu thereof.

State v. Davis

Accordingly, it is hereby ordered that these cases be remanded to the Superior Court of Lenoir County with directions (1) that the presiding judge, without requiring the presence of defendants, enter as to each defendant a judgment imposing life imprisonment for the first degree murder of which he has been convicted; and (2) that in accordance with these judgments the clerk of superior court issue commitments in substitution for the commitments heretofore issued. It is further ordered that the clerk furnish to each defendant and his attorney a copy of the judgment and commitment as revised in accordance with this opinion.

In No. 74CR1103 (Davis, armed robbery)—judgment arrested.

In No. 74CR1102 (Davis, murder)—death sentence vacated and, in lieu thereof, life sentence substituted.

In No. 74CR1249 (Foster, armed robbery)—judgment arrested.

In No. 74CR1248 (Foster, murder)—death sentence vacated and, in lieu thereof, life sentence substituted.

In the verdicts—no error.