STATE OF NORTH CAROLINA v. ADNELL HUNT

No. 65

. (Filed 20 April 1979)

1. **Constitutional Law § 56— jurors in courtroom during guilty pleas and evidence in other cases—G.S. 15A-943—right to impartial jury**

    The fact that defendant was tried by jurors who, on the morning of his trial, had the opportunity to hear "a number of pleas and sentences imposed" in other and unrelated cases did not violate the spirit of G.S. 15A-943 and create a jury biased against defendant, since that statute dealt with calendaring of arraignments and was therefore inapplicable to defendant's case, and since there was no showing that the jurors acquired any bias because of anything they heard when the court disposed of three or four unrelated cases upon pleas of guilty.

2. **Criminal Law § 88.4— cross-examination of defendant—prior conviction— denial—no prejudice**

    Defendant was not prejudiced by the district attorney's question on cross-examination as to whether defendant had been convicted of first degree burglary and rape since there was no evidence in the record tending to show that the district attorney asked the question in bad faith or that defendant attempted to develop such evidence, and since defendant answered the question with a positive denial before the judge had time to rule on defense counsel's objection.

    Justices BRITT and BROCK took no part in the consideration or decision of this case.

APPEAL by defendant under G.S. 7A-27 from *Hobgood, J.,* 5 April 1978 Session of the Superior Court of ROBESON. This case was docketed and argued as Case No. 63 at the Fall Term 1978.

Defendant was convicted of an assault with the intent to commit rape and first-degree rape. He appeals concurrent sentences of fifteen years and imprisonment of life in the State Prison. Evidence for the State tended to show the following events:

On the evening of 11 November 1977 Jack Jacobs, Robert Hunt, Mrs. Margaret Louise Edwards (a prosecuting witness) and her two daughters, Lizzie Ann Edwards, aged 16 (a prosecuting witness), and Debra Lee Edwards, went to the home of Liza Mae Hunt where they joined others who had come to drink beer, listen to music and dance. All but Lizzie Ann and Debra drank some beer. While they were at Liza's house defendant Adnell Hunt, whom Lizzie had not known before, arrived and joined the party.

When Mrs. Edwards and her daughters left Liza Mae's house Jack Jacobs drove them home and then went on his way. Although they had not been invited to do so, defendant and Robert Hunt followed the Jacobs car to the Edwards home and entered the house with them. Mrs. Edwards testified, "I didn't tell them not to come in [and] I didn't ask them to come in."

Once inside, the group sat in the front room and listened to music for a while. The two men drank beer which they had brought with them; the women drank nothing. After a while Mrs. Edwards told the men to leave, that she wished to retire. Defendant said his car was hot and wouldn't crank until it had cooled off. When told to try it anyway, he made an unsuccessful effort to start the car and came back into the house. Mrs. Edwards retired to her bedroom and in about ten minutes the two men again went out to the car. Debra and Lizzie walked to the front porch with them, but when the car would not start they reentered the house.

The girls were in their mother's bedroom when they heard defendant go down the hall and into the kitchen. From the kitchen defendant entered the bedroom, closed the door, "snatched out a knife" from under his shirt, and said, "he wouldn't leave until he got to see what he wanted to see." Mrs. Edwards grabbed the knife and tried to take it from him. At that time the light, which "had a string hanging down from it," went off. The two girls were screaming and Lizzie Ann "hollered" to Robert Hunt, who was in the front room, to "call the law." Robert made a vain attempt to push the door open, and at that point the light came back on.

Lizzie Ann observed that Mrs. Edwards' hand had been cut, that there were four slits in the back of her bloody nightgown, and that defendant was holding the knife next to her neck. Defendant told Debra and Lizzie that if they did not have their

clothes off in two minutes he would kill their mother. However, because it was cold in the bedroom, defendant directed everyone into the front room. When they went in they found that Robert Hunt had gone. Defendant then ordered Debra and Mrs. Edwards to return to the bedroom, and forced Lizzie to undress by threatening to kill her with the knife if she didn't do what he said. Immediately thereafter he proceeded to have sexual intercourse with her, all the while holding the knife against her back. After about 10 minutes he called Mrs. Edwards into the front room and told her to watch what he and Lizzie were doing. Both Lizzie and Mrs. Edwards were crying and defendant threatened to kill Lizzie if Mrs. Edwards didn't stop crying. Mrs. Edwards stopped. Lizzie testified that at all times during the events detailed herein defendant held the knife by the handle and the sharp side of the blade against her.

After finishing with Lizzie, defendant ushered her and Mrs. Edwards back into the bedroom. Not seeing Debra he demanded to know where she was. Mrs. Edwards told him Debra had gone for help. With the knife at Lizzie's back he marched the two women out on the back porch and forced Lizzie to call Debra. When Debra did not answer he returned them to the bedroom where, at knife point, he again penetrated Lizzie and threatened to kill her unless Mrs. Edwards made oral contact with his scrotum. After three to five minutes of this he required Mrs. Edwards to have sexual intercourse with him and directed Lizzie to lie beside him. Some minutes later he required Mrs. Edwards to perform cunnilingus upon Lizzie and then fellatio upon him. All this time he had the knife at Lizzie's throat. In about ten minutes he told Mrs. Edwards to stop and again ordered Lizzie to mount him. Shortly thereafter he directed her to lie down beside him.

He was lying on the bed between the two women, the knife still on Lizzie, when they heard sirens approaching and cars stop in the yard. Defendant threatened the women if they moved or made a sound. Nobody moved until they heard the order from outside, "Break in the door!" Defendant then leaned over Mrs. Edwards and put the knife on the floor. At that moment four uniformed officers came into the room. Defendant was arrested and the two women were taken to the emergency room of the Southeastern General Hospital. There they were examined by Dr. W. E. Neal, Jr., who testified that Mrs. Edwards had multiple

superficial lacerations of the left hand, back and right side of the neck and that a pelvic examination revealed motile sperm in both the mother and daughter. Each one told the doctor that, at knife point and upon threat of death, defendant had forced her to have intercourse with him.

Defendant, aged 29, testified in his own behalf and called three witnesses. The record states without further explanation that the testimony of these witnesses "is omitted." Defendant's testimony tended to show:

He was among those present at the home of his cousin, Liza Mae Hunt, on the evening of 11 November 1977. While there he danced with Lizzie Edwards, and she asked him to go home with her. When the Edwards left the party, he and Robert Hunt followed them in defendant's car, which contained a case of beer. At the Edwards' home they listened to music, drank beer and danced. Then there came a time when Robert and Debra walked out of the house and Mrs. Edwards was not in the room, and that's when he and Lizzie "had sexual intercourse but [he] didn't have it by no force."

Defendant admitted he had sexual intercourse with Lizzie Ann three times that night, once in the front room and twice in the bedroom. However, he insisted it was all by consent. He said, "I at no time threatened her. I don't recall threatening her at any time. I don't recall threatening her mother at any time. I don't recall threatening her sister." Defendant denied going into the kitchen, taking a knife into the bedroom, cutting Mrs. Edwards, and being in the bed with Mrs. Edwards. He insisted that the account which Lizzie and Mrs. Edwards gave of events transpiring in the bedroom that night was "all made up on him by somebody." His testimony was that Lizzie Ann was in the bedroom with him when the officers got there and he didn't know where her mother was.

Upon cross-examination, defendant testified that he had been convicted of assaulting a police officer, disorderly conduct, assault on a female, carrying a concealed weapon, driving without a license, driving under the influence of an intoxicant, hit and run, assault with a deadly weapon, and that he had escaped while serving a six-month's sentence.

*Rufus L. Edmisten, Attorney General, and Thomas F. Moffitt, Assistant Attorney General, for the State.*

*Adelaide G. Behan for defendant.*

SHARP, Chief Justice.

[1]   Defendant's first assignment of error is that the trial judge permitted his case to be tried by jurors who, on the morning of his trial, had the opportunity to hear "a number of pleas and sentences imposed" in other and unrelated cases. Defendant argues that this situation violated the spirit of G.S. 15A-943 and "created a jury biased against him." His thesis is that "after hearing police officers testify in three or four other cases in which there has been an admission of guilt" jurors would be more inclined to credit the officers' testimony in cases in which the defendant's plea was not guilty, and might be inclined to desert their true function and become a vigilance committee. We find no merit in these contentions.

G.S. 15A-943 has no application to this case. Subsections (a) and (c) of this statute deal with the calendaring of arraignments and subsection (b) only provides that no defendant may be tried during the week in which he is arraigned unless he consents. *See State v. Shook,* 293 N.C. 315, 237 S.E. 2d 843 (1977). Defendant does not suggest that he was arraigned the same week of his trial. Nor does the record disclose any reason to suspect that the jurors might have been prejudiced against defendant by anything they heard when the court disposed of "three or four" unrelated cases upon pleas of guilty.

There is no way in which a criminal session of court can be held and jury trials conducted without exposing jurors to the courthouse environment. However, "our system for the administration of justice through trial by jury is based upon the assumption that the trial jurors are men of character and of sufficient intelligence to fully understand and comply with the instructions of the court, and are presumed to have done so." *State v. Ray,* 212 N.C. 725, 729, 194 S.E. 482, 484 (1937). Defendant had ample opportunity during the selection of the jury to question the jurors about possible bias and to challenge those who indicated they had acquired any bias. *See State v. Baldwin,* 276 N.C. 690,

174 S.E. 2d 576 (1970); *State v. Corl*, 250 N.C. 258, 108 S.E. 2d 615 (1959). No evidence of bias was disclosed.

[2]   Defendant next contends that the following incident which occurred during the cross-examination of defendant demonstrated bad faith on the part of the district attorney and was sufficiently prejudicial to require a new trial:

> Q. 1973, did you not get convicted of first-degree burglary and rape?
>
> Objection by defendant.
>
> A. No, Sir, I did not. Found me not guilty on it.

With reference to this question and answer we note: (1) No evidence in the record tends to show that the district attorney asked the question in bad faith or suggests that defendant attempted to develop such evidence. (2) Before the judge had time to rule on the objection defendant answered the question with a positive denial. *See State v. McNair*, 272 N.C. 130, 157 S.E. 2d 660 (1967). We find no error prejudicial to defendant in this exchange.

The third assignment which defendant brings forward attacks "numerous incidents in the argument of the district attorney as having such a prejudicial effect on the jury as to constitute reversible error when reviewed cumulatively." The arguments of both defense counsel and the district attorney are in the record, and we have carefully considered each in its entirety and in relation to the other. Having done so, we conclude that the district attorney's remarks did not exceed the bounds of legitimate argument and overrule this assignment also. Numerous decisions of this Court hold that the argument of counsel must be left largely to the control and discretion of the presiding judge whose discretion we will not review "unless the impropriety of counsel was gross and well calculated to prejudice the jury." *State v. Barefoot*, 241 N.C. 650, 657, 86 S.E. 2d 424, 429 (1955). *See State v. Stegmann*, 286 N.C. 638, 213 S.E. 2d 262 (1975).

The conscientious trial judge carefully monitored the arguments of counsel in this case from beginning to end. During the course of the district attorney's speech to the jury he was interrupted twenty-five times by the objections of defense counsel. All but one were overruled. In sustaining the one, Judge Hobgood

corrected the district attorney's misinterpretation of a totally irrelevant and inconsequential opinion expressed by defense counsel in her argument. This action by the judge removed any possible prejudice that might have been engendered by the misstatement. *State v. Thompson*, 293 N.C. 713, 239 S.E. 2d 465 (1977).

Appropriate in this case is Justice Higgins' comment in *State v. Barefoot*, supra at 658, 86 S.E. 2d at 430, "In view of the evidence of this case it is difficult to see how the solicitor's argument could have influenced the verdict." So far as we know, conduct more bestial and depraved than that attributed to this defendant by the State's witnesses cannot be found in the pages of our Reports.

Defendant's fourth and final assignment of error charges that his right of confrontation under N.C. Const., Art. I, § 23 was abridged when the court "permitted the witness, Lizzie Ann Edwards, to respond to the questioning of the district attorney in a narrative manner." As to this assignment, it suffices to say that in the record statement of this witness's evidence we perceive no irregularity in the manner in which she gave her testimony.

In the trial below we find

No error.

Justices BRITT and BROCK took no part in the consideration or decision of this case.