STATE OF NORTH CAROLINA v. KELLY DEAN SPARKS

No. 64

(Filed 12 June 1979)

1. **Constitutional Law §§ 34, 80— death penalty vacated—imposition of life sentence proper—retrial on same offense proper**

There is no merit to defendant's contention that imposition of a life sentence after the U.S. Supreme Court vacated the imposition upon him of the death penalty was illegal and that having once been sentenced illegally he could not be retried for the same offense, since the action of the N.C. Supreme Court in imposing the life sentence was consistent with the mandate of the U.S. Supreme Court pending its determination of whether *Mullaney v. Wilbur*, 421 U.S. 684, was retroactive, and a retrial of defendant after it was ultimately determined that he was entitled to rely on the *Mullaney* error in his original trial did not constitute double jeopardy.

2. **Constitutional Law § 50— speedy trial—delay caused by appeal process**

Defendant was not denied a speedy trial by the lapse of time between 6 July 1976, when the U.S. Supreme Court ordered reconsideration of his case in light of *Mullaney v. Wilbur*, 421 U.S. 684, and 12 September 1977, when the N.C. Supreme Court ordered that defendant receive a new trial, since defendant's case presented the difficult question whether *Mullaney* was to be retroactively applied, and delays in bringing a defendant to trial that result from the need to assure careful review of an unusually complex case on appeal do not constitute denial of a speedy trial.

3. **Arrest and Bail § 9.1— first degree murder—"capital offense" within meaning of bail statute**

· Whether or not a particular defendant, depending upon the date his crime was committed, faces the death penalty, the crime of first degree murder is a "capital offense" within the meaning of G.S. 15A-533(b), so that the release of such defendant on bail is a matter to be determined within the discretion of the trial judge.

4. **Constitutional Law § 82; Prisons § 2— imprisoned defendant—adequate medical services provided**

Where defendant, who was confined in Central Prison, was stabbed by other inmates, was given immediate medical attention, and was subsequently evaluated and given physiotherapy, evidence was sufficient to support the trial court's finding that defendant was provided with "adequate medical, surgical and hospital services," and an interruption of defendant's physiotherapy program while confined in a county jail waiting for retrial would not have any serious, long-term adverse effect on his condition and therefore would not amount to a denial of adequate medical care and therapy.

5. **Constitutional Law § 82; Convicts and Prisoners § 3— defendant in prison—safety adequately provided for**

Where defendant was held in maximum security in Central Prison after his assault by other inmates and the trial court, upon imposing sentence after

State v. Sparks

retrial, recommended "that defendant be held in custody in a manner to protect him from danger to his person and life," the evidence clearly showed that reasonable steps were taken to protect defendant's safety after his injury.

**6. Criminal Law § 128.2— homicide case—introduction of victim's widow to jury —no mistrial**

In a prosecution for first degree murder, defendant was not entitled to a mistrial because the prosecutor introduced a lady to the jury as the widow of the victim, since the court sustained the defense attorney's objection to the introduction of the widow and no further references to her were made; she was introduced as a potential witness but a stipulation by the defense attorney subsequently rendered her testimony unnecessary; the trial court offered to give the jury instructions or to allow defendant to question the members of the jury to see if they had been prejudiced, but defendant declined; and the trial court made it clear that no emotional outbursts would be permitted in the courtroom.

**7. Constitutional Law § 56— observation of court processes by jurors—no prejudice to defendant**

Defendant was not entitled to a mistrial in a first degree murder case where, in the presence of the jury that tried defendant, the grand jury returned five unrelated first degree murder indictments and were thanked by the trial court for their "service as a necessary part of the process of enforcing the law and protecting society," since mere observation by the jury of other lawful courtroom processes will not be presumed to result in prejudice to defendant.

**8. Criminal Law § 50.1— expert opinion—test of admissibility**

The proper inquiry to make in determining the admissibility of an expert opinion is not whether it invades the province of the jury but is instead whether the opinion expressed is really one based on the special expertise of the expert, that is, whether the witness because of his expertise is in a better position to have an opinion on the subject than is the trier of fact.

**9. Criminal Law § 50.1— homicide—position of victim's body —expert opinion evidence admissible**

The trial court in a first degree murder case did not err in admitting testimony by a forensic pathologist as to the possible position of the victim's body at the time of infliction of a bullet wound, since the witness, as a result of his expertise and his opportunity for personal observation of the body, was in a better position than the jury to form such an opinion.

**10. Criminal Law § 57— gunshot residue on defendant's hand—chemist's testimony admissible**

In a prosecution for first degree murder, the trial court properly admitted testimony by a forensic chemist that he performed tests on swabbings taken from defendant's hands, that gunshot residue was present on defendant's hand, and that defendant could have fired a gun with his left hand.

11. **Criminal Law § 57— chemical test—possible presence of gunpowder—admissibility of expert evidence**

The trial court in a first degree murder prosecution did not err in permitting a forensic chemist to testify that he performed certain tests on defendant's trousers, the tests showed the presence of nitrites, and nitrites are produced by, among other substances, burned gunpowder, since the tests were reliable for the purpose for which they were used, and the results of the tests were to some extent corroborative of other evidence tending to show defendant discharged a firearm and were therefore relevant.

12. **Criminal Law § 88.1— testimony at earlier trial—cross-examination—searching transcript not permitted**

There is no merit to defendant's contention that the trial court improperly limited his cross-examination of a prosecution witness where the witness testified that she "believed" she had made a similar statement in defendant's earlier trial; the trial court refused to permit the witness to search through a transcript of the earlier trial to find her statement; and the matter under inquiry was of only marginal relevancy.

13. **Criminal Law § 73.1— hearsay statement—admission not prejudicial**

The trial court erred in admitting testimony by a police officer, who arrived at the scene of a shooting several minutes after it occurred, that a witness, in response to the officer's question as to what happened, stated that defendant had shot the police chief, since such testimony did not corroborate the in-court testimony of the witness who had made the statement at the crime scene, and since the statement was not a spontaneous utterance but was inadmissible hearsay; however, in light of the State's strong evidence that defendant was the perpetrator of the crime in question, there was no reasonable possibility that a different result would have been reached had such testimony been excluded.

14. **Criminal Law § 40.1— transcript of earlier trial—corroborative portions admissible**

The trial court did not err in allowing the court reporter to read from the transcript of defendant's first trial in this same case, since the reporter read only those portions of the transcript containing testimony by persons who testified at the second trial, and testimony at a former trial is admissible for corroborative purposes.

15. **Criminal Law § 101.2— transcript of earlier trial—no viewing by jury**

There is no merit to defendant's contention that he was entitled to a mistrial because jurors who examined the transcript of his first trial might see his conviction and death sentence in the earlier case and he might thereby be prejudiced, since there was no indication in the record that the jury was allowed to examine the transcript.

16. **Constitutional Law § 80; Homicide § 31.1— first degree murder—life sentence upon second conviction**

On retrial the trial court did not err in imposing a life sentence upon defendant for conviction of first degree murder, and the defendant's contention

that the maximum penalty he could receive was imprisonment for ten years under G.S. 14-2 is without merit.

**17. Arrest and Bail § 9.2— bail pending appeal—discretionary matter**

Defendant failed to show an abuse of the trial court's discretion in refusing to set bail while the case was on appeal. G.S. 15A-536.

Justices COPELAND, BRITT and BROCK did not participate in the consideration or decision of this case.

BEFORE *Judge Wood* at the 27 February 1978 Session of GUILFORD Superior Court and on a bill of indictment proper in form, defendant was tried and convicted of first degree murder and sentenced to life imprisonment. He appeals under G.S. 7A-27(a). The case was docketed and argued as No. 58 at the Fall Term 1978.

*Rufus L. Edmisten, Attorney General, by Thomas B. Wood, Assistant Attorney General, for the State.*

*Robert S. Cahoon, Attorney for defendant appellant.*

EXUM, Justice.

Defendant has sought to bring forward over 200 exceptions to the rulings of Judge Wood at trial and Judge Seay on various pre-trial motions. We discuss here only the more significant points he raises. As to the rest, suffice it to say that we have examined the record and briefs carefully and find that defendant has received a fair trial free from prejudicial error.

Defendant was charged with murdering George Lashley, Chief of Police of Gibsonville, on the morning of 30 June 1973. The state's evidence tended to show that defendant had spent the day before in the company of Darrell Stone, Paula Rogers and Robin Diane Phillips. They drove into the country and stopped at a lake where defendant and Stone shot a .25 caliber pistol belonging to defendant. The four then returned to Greensboro. The two girls went to a bar. Defendant and Stone met them there around 7:30 p.m. They "drove around" and decided to buy illegally or steal some drugs from a doctor's office in Gibsonville. In their possession at this time were defendant's .25 caliber pistol and a sawed-off shotgun apparently belonging to Stone. They went to Gibsonville but decided there were too many people near the of-

fice for them to go through with their plans at that time. They got something to eat and then parked near one of the city sewer system's pump stations to rest. All four fell asleep.

They were discovered on the morning of June 30th by Vance Thomas Evans, a city employee. He contacted the police, and Chief Lashley came to investigate. When Lashley arrived, he observed the sawed-off shotgun, placed defendant under arrest and handcuffed him. He told the other occupants to get out of the car. Defendant and Stone were on the driver's side; the two girls on the passenger side. Both doors to the car were left standing open. Chief Lashley then searched the car, first the driver's side and then the passenger side. Defendant's .25 caliber pistol had been left under the driver's seat. Lashley apparently did not discover it in his search. As he was searching the passenger side of the car, defendant positioned himself in the doorway on the driver's side. While Lashley was leaning over looking through a bag, defendant turned, looked over his shoulder at Lashley, and a shot was fired. It struck Lashley, and he died a few minutes later. Defendant ran into some nearby woods, dropping the .25 caliber pistol as he fled. The cause of Lashley's death was a wound from a .25 caliber bullet, which entered beneath his shoulder, passed through his aorta and lodged near his pancreas.

This case has had a lengthy history. It was first tried before Judge, now Justice, Copeland, at the 29 October 1973 Criminal Session of Guilford Superior Court. At that trial defendant was convicted and sentenced to death. This Court found no error in the trial or the sentence imposed. *State v. Sparks*, 285 N.C. 631, 207 S.E. 2d 712 (1974). On 6 July 1976 the United States Supreme Court vacated the imposition of the death penalty and remanded the case to this Court for further proceedings in light of *Mullaney v. Wilbur*, 421 U.S. 684 (1975). *Sparks v. North Carolina*, 428 U.S. 905 (1976). On 1 September 1976 this Court remanded the case to Guilford Superior Court for imposition of a life sentence. That sentence was imposed on 14 September 1976. On 7 December 1976 we clarified our 1 September order by noting our holding in *State v. Hankerson*, 288 N.C. 632, 220 S.E. 2d 575 (1975), that *Mullaney v. Wilbur, supra,* was not retroactive. We stated that it would be inappropriate to grant defendant a new trial prior to a decision by the United States Supreme Court in *Hankerson*, which was then before it on writ of certiorari. On 17 June 1977 that Court

reversed our decision in *Hankerson* on retroactivity and held that *Mullaney* was fully retroactive. *Hankerson v. North Carolina*, 432 U.S. 233 (1977). Thereafter, on 12 September 1977, we ordered that defendant Sparks receive a new trial. *State v. Sparks*, 293 N.C. 262 (1977).

On 26 June 1977 defendant Sparks was assaulted and stabbed by other inmates in Central Prison. He suffered neurological damage caused by an indirect injury to his spinal cord. As a result, he has a disordered gait, difficulties with balance and various other symptoms. He was hospitalized for some time with these injuries. After his release he was held in the maximum security area of Central Prison until September, 1977, when he was transferred to Guilford County Jail to await trial.

On 10 October 1977 defendant filed a motion to dismiss and for other relief. By this motion he sought (1) dismissal of the indictment against him, (2) bail, (3) provision of proper medical care and therapy, and (4) assurance of protection from abuse, terrorization and injury while in confinement. On 20 December 1977 Judge Seay, after painstakingly conducting a full evidentiary hearing, denied this motion and refused to grant the relief sought. Defendant's first assignment of error challenges this ruling.

[1] Defendant argues that the indictment against him should have been dismissed on grounds of (1) double jeopardy and (2) denial of his right to a speedy trial. With regard to his double jeopardy argument, defendant contends that the imposition of a life sentence on 14 September 1976 was illegal and that having once been sentenced illegally he cannot be retried for the same offense. Without commenting on the validity of the remainder of defendant's argument, we cannot agree with his conclusion because we disagree with his initial premise that he was illegally sentenced. The United States Supreme Court remanded defendant's case to this Court for reconsideration in light of *Mullaney v. Wilbur, supra*, 421 U.S. 684. It was our conclusion that *Mullaney* was not retroactive, *see State v. Hankerson, supra*, 288 N.C. 632, 220 S.E. 2d 575, and that defendant was thus not entitled to a new trial. Upon vacation of defendant's death sentence, the only alternative penalty was life imprisonment. *See State v. Davis*, 290 N.C. 511, 227 S.E. 2d 97 (1976). We therefore remanded defendant's case to Guilford Superior Court for the sole purpose

of imposing that penalty. Our actions were consistent with the mandate of the United States Supreme Court pending its determination whether *Mullaney* was retroactive. The sentencing of defendant in Guilford County Superior Court on 14 September 1976 was entirely proper. A retrial of defendant after it was ultimately determined that he was entitled to rely on the *Mullaney* error in his original trial does not constitute double jeopardy. *See State v. Stafford,* 274 N.C. 519, 164 S.E. 2d 371 (1968).

[2] Defendant's argument that he was denied a speedy trial is based on the interim between 6 July 1976, when the United States Supreme Court ordered reconsideration of his case in light of *Mullaney v. Wilbur, supra,* and 12 September 1977, when this Court ordered that he receive a new trial. Delays in bringing a defendant to trial that result "from the need to assure careful review of an unusually complex case" on appeal do not constitute denial of a speedy trial. *Harrison v. United States,* 392 U.S. 219, 221-22 n. 4 (1968). Defendant's case presented the difficult question whether *Mullaney v. Wilbur, supra,* was to be retroactively applied. This Court, after careful examination of the authorities, had expressed its opinion in *State v. Hankerson, supra,* that *Mullaney* was not retroactive. We initially denied defendant a new trial in accordance with that opinion. Shortly after the United States Supreme Court's reversal of our *Hankerson* decision as to retroactivity defendant was granted a new trial. The actions of this Court comported with the orderly functioning of the appellate process. We find no merit in defendant's contention that he was thereby deprived of a speedy trial.

Defendant contends Judge Seay erred in denying him bail. Even if it were error to do so defendant would not be entitled to relief on appeal unless he could show he was prejudiced in the preparation of his trial. *State v. Jones,* 295 N.C. 345, 245 S.E. 2d 711 (1978). He has made no such showing.

[3] Moreoever, it was not error to deny defendant bail. G.S. 15A-533(b) provides: "A judge may determine in his discretion whether a defendant charged with a capital offense may be released before trial." Defendant was charged with first degree murder. At the time he allegedly committed the crime, it was a capital offense. *See* 1B N.C. Gen. Stat. § 14-17 (1969). At the time

his motion was before Judge Seay, this crime was likewise a capital offense. *See* G.S. §§ 14-17, 15A-2000. Defendant himself did not face the death penalty only because the United States Supreme Court had decided that its imposition according to the statute under which he was charged would be cruel and unusual punishment. *See Woodson v. North Carolina,* 428 U.S. 280 (1976). We hold that whether or not a particular defendant depending upon the date his crime was committed faces the death penalty the crime of first degree murder is a *"capital offense"* within the meaning of G.S. 15A-533(b). This is so notwithstanding that the trial itself may not be a "capital case" within the meaning of the jury selection statute, G.S. 15A-1217. *See State v. Leonard,* 296 N.C. 58, 248 S.E. 2d 853 (1978); *State v. Barbour,* 295 N.C. 66, 243 S.E. 2d 380 (1978). Thus the grant or denial of bail here was within the trial court's discretion, abuse of which was not shown.

[4] Defendant next complains of Judge Seay's denial of his motion to "provide him with proper and adequate medical care and therapy." This Court recognized the duty of prison officials acting as agents of the public to provide necessary medical care to prisoners under their charge in *Spicer v. Williamson,* 191 N.C. 487, 490, 132 S.E. 291, 293 (1926): "The prisoner by his arrest is deprived of his liberty for the protection of the public; it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself." More recently the United States Supreme Court has held that "deliberate indifference to serious medical needs of prisoners con-stitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976).

The evidence presented on the motion showed that the stab wounds defendant received on 26 June 1977 were potentially fatal. He received immediate medical attention from doctors at the prison. Their treatment saved his life. As he recovered, these doctors noted symptoms of a spinal cord injury and referred him to a neurologist for evaluation. The eventual diagnosis was that a blood vessel supplying the spinal cord had been punctured when defendant was stabbed, resulting in permanent damage to the spinal cord itself. This condition is not correctible by surgery or medication. Defendant's motor functions can be kept from deterioration by physiotherapy, but it is doubtful that any signifi-

cant improvement is possible. While defendant was at Central
Prison, he was on a rehabilitation program. This was halted when
he was transferred to Guilford County Jail in preparation for the
trial of this case.

Judge Seay found as a fact that defendant had been provided
with "adequate medical, surgical and hospital services." This find-
ing was supported by the evidence. There was no substantial
evidence to show that defendant had been denied necessary
medical care or that corrections officials had shown "deliberate in-
difference" to his serious medical needs. Indeed, the evidence is
completely to the contrary. While defendant's detention in
Guilford County Jail interrupted his physiotherapy program,
which may have resulted in some temporary discomfort, there is
nothing in the record to indicate that such a relatively brief inter-
ruption would have any serious long-term adverse effect on his
condition. There is, in fact, testimony in the record tending to
show that defendant might have suffered many of the same symp-
toms even had therapy continued. Taking all these circumstances
into account, we conclude that Judge Seay did not err in denying
this motion.

[5] The last of defendant's requests for relief was that the court
"take necessary steps to prevent the defendant being held in any
facility where he will be subject to abuse, injury, and terroriza-
tion." The evidence showed that after the assault on defendant he
was treated in the prison hospital for some time and thereafter
held in the maximum security area of Central Prison for his own
protection. He was sent to Guilford County Jail in September,
1977. There was no evidence that defendant was subject to any
official harassment. The evidence clearly shows that reasonable
steps were taken to protect defendant's safety after his injury.
Judge Seay so found. We note, moreover, that in finally imposing
sentence Judge Wood recommended "that defendant be held in
custody in a manner to protect him from danger to his person and
life."

Defendant having shown no error in the denial of his motion
to dismiss and for other relief, this assignment of error directed
thereto is overruled.

By his third assignment of error defendant challenges the
trial court's denial of his motion for a change of venue. This mo-

tion was apparently on the ground that prejudice against defendant in Guilford County was so great that he could not receive a fair trial. Motions for a change of venue on such grounds are governed by G.S. 15A-957, which states in pertinent part:

"If, upon motion of the defendant, the court determines that there exists in the county in which the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial, the court must either:

(1) Transfer the proceeding to another county in the judicial district or to another county in an adjoining judicial district, or

(2) Order a special venire under the terms of G.S. 15A-958."

The burden of showing the existence of prejudice is on the defendant. *State v. Boykin*, 291 N.C. 264, 229 S.E. 2d 914 (1976). There is no evidence of prejudice whatsoever in the record before us. It was therefore not error to deny defendant's motion for a change of venue.

[6, 7] By his fourth assignment of error defendant contends that the trial court erred in denying his first motion for mistrial. Defendant based this motion on two occurrences. First, during the jury selection process, the prosecutor introduced to the jury a certain Mrs. Ellison as the widow of Chief Lashley. Second, in the presence of the jury that tried defendant, the grand jury returned five unrelated first degree murder indictments and were thanked by the trial court for their "service as a necessary part of the process of enforcing the law and protecting society."

We see nothing in either of these occurrences necessitating a mistrial. As to the first, the record indicates that after Mrs. Ellison was introduced the defense attorney objected and the trial court sustained his objection. No further references to her appear to have been made. She was introduced as a potential witness for the purpose of identifying Chief Lashley and some of his personal effects. A stipulation by the defense attorney subsequently rendered her testimony unnecessary. The trial court offered to give the jury instructions or to allow defendant to question the members of the jury to see if they had been prejudiced. Defendant declined. The trial court further made it clear

that no emotional outbursts would be permitted in the courtroom. Under these circumstances it was not prejudicial to defendant to deny his motion for a mistrial on the ground stated. As to the second ground, the returning of verdicts by the grand jury, mere observation by the jury of other lawful courtroom processes will not be presumed to result in prejudice to defendant. *See State v. Hunt*, 297 N.C. 131, 254 S.E. 2d 19 (1979) (no assumption of bias from fact jury heard pleas taken and sentences imposed in other cases). Defendant's fourth assignment of error is without merit.

Defendant next assigns as error the introduction against him of well over one hundred unrelated items of evidence. We have considered each of the points argued by defendant and conclude that the trial court did not commit prejudicial error in the admission of this evidence. We discuss two of the matters raised here, one relating to the admissibility of certain expert testimony and the other relating to testimony concerning scientific tests.

Dr. John Dailey, a forensic pathologist, conducted the autopsy on Chief Lashley. He testified he recovered a .25 caliber bullet from the body; the bullet entered in the area of the right shoulder; it tracked downward and to the left, passing through the right lung and the aorta; and it came to rest in the area of the pancreas. It was Dr. Dailey's opinion that Chief Lashley died as a result of hemorrhage caused by the gunshot wound.

In the course of the direct examination of Dr. Dailey, the following exchange took place:

"Q. . . . Dr. Dailey, based upon your education and your experience in the field of forensic pathology and based upon your examination on June 30, 1973, of the person and the wound or the wound of George Lashley, do you have an opinion satisfactory to yourself as to the position of George Lashley at the time the wound which you observed was inflicted?

A. I have an opinion as to the position, yes.

Q. What is that opinion?

A. Its position would have had to be such —

MR. CAHOON: We object to this.

COURT: Overruled.

EXCEPTION NO. 139

A. That it would be consistent with the track of the wound I have already described. His position would have had to be such that the bullet would have come into the right shoulder, passed from right to left, from top to bottom, and slightly from front to back, and this is the position that the body would have to be in. The positions that a body could assume in such a situation would be an individual bending forward such as this, or an individual seated such as this, being shot from above with the wound coming in and the bullet going down, or an individual standing up likewise coming in and going down, or an individual lying on his back with the gun held close to the ground and the bullet fired from right —the gun fired from right to left with the bullet passing in this particular trajectory."

[8, 9] Defendant argues that this opinion was inadmissible because it "invaded the province of the jury." As we tried to make clear in *State v. Wilkerson*, 295 N.C. 559, 247 S.E. 2d 905 (1978), this is not the proper inquiry to make in determining the admissibility of expert opinion. The test is rather "whether the opinion expressed is really one based on the special expertise of the expert, that is, whether the witness because of his expertise is in a better position to have an opinion on the subject than is the trier of fact." *Id.* at 568-69, 247 S.E. 2d at 911. Applying this test here, Dr. Dailey's opinion was properly admitted. He was an experienced forensic pathologist, and he had conducted a personal examination of the body. He was able to tie the positions the body might have been in with the track the bullet took through the body. We have no doubt that as a result of his expertise and his opportunity for personal observation of the body he was in a better position than the jury to form an opinion on this question. Our holding of admissibility here is, moreover, consistent with a long line of decisions of this Court holding similar expert opinions admissible. *See State v. Powell*, 238 N.C. 527, 78 S.E. 2d 248 (1953) (deceased's hand in front of her face when she was shot); *State v. Stanley*, 227 N.C. 650, 44 S.E. 2d 196 (1947) (deceased lying down when wounds inflicted); *George v. R.R.*, 215 N.C. 773, 3 S.E. 2d 286 (1939) (deceased lying on railroad tracks when struck

by train); *State v. Fox*, 197 N.C. 478, 149 S.E. 735 (1929) (deceased lying down when shot).

[10]  Mr. R. D. Cone, a forensic chemist with the North Carolina State Bureau of Investigation, also testified as an expert witness for the state. Mr. Cone testified as to two scientific tests he performed. In the first Mr. Cone analyzed certain swabbings shown by the state to have been taken from the hands of defendant. In making this analysis Mr. Cone would take a portion of a swabbing, combine it with a hydrochloric acid solution in a test tube and agitate it. He would then examine the solution using flameless atomic absorption spectrophotometry in an attempt to determine whether barium, antimony and lead were present. According to Mr. Cone, their presence would indicate the presence of gunshot residue. Mr. Cone found significant concentrations of these elements in a swabbing from the back of defendant's left hand. On the basis of these findings, it was his opinion that defendant "could have fired a gun with his left hand."

We have no doubt that Mr. Cone's conclusion based on the test as described was properly admitted. In *State v. Crowder*, 285 N.C. 42, 203 S.E. 2d 38 (1974), *death penalty vacated*, 428 U.S. 903 (1976) (a case coincidentally involving testimony by the same witness as here), this Court upheld the admission of both the results of this type of test and the conclusion arising from it. Justice Huskins, writing for the Court, stated, *id.* at 53-55, 203 S.E. 2d at 46-47:

"SBI Chemist Cone testified that, using flameless atomic absorption spectrophotometry, he personally analyzed the gunshot residue wipings taken by Agent Sampson from defendant's hands to determine whether they contained barium, antimony and lead. This analysis showed 'significant concentrations' of all three elements in the wipings taken from the back of defendant's right hand and the palm of his left hand. Based on these test results, Mr. Cone testified that in his opinion 'the subject could have handled and fired a gun.'

. . . .

"Independent research on gunshot residue tests verifies the reliability of this type of test. In a series of tests per-

formed on persons involved in occupations where occupational contamination of the hands might cause interference with the test procedure, researchers have found that '[n]o false tests were obtained nor failure of tests to detect antimony, barium, and lead were encountered because of occupational contamination of the hands.' Harrison and Gilroy, Firearms Discharge Residues, 4 J. For. Sci. 184, 198 (1959). Although chemical reagents were used in the Harrison and Gilroy experiments to test for the presence of firearm discharge residue rather than flameless atomic absorption spectrophotometry, as in this case, the difference does not appear significant. Flameless atomic absorption spectrophotometry appears to be an improvement over the use of chemical reagents because chemical reagents detect only the presence of significant concentrations of the three test elements whereas spectrophotometry can also determine the weight of the elements deposited on the subject's hands.

"The crucial concern with tests of this type is that the test could indicate that a subject had fired a handgun when in fact he had not. It was for this reason that many courts rejected the dermal nitrate (paraffin) test. *See Brooke v. People*, 139 Colo. 388, 339 P. 2d 993 (1959); *Born v. State*, 397 P. 2d 924 (Okla. Crim. 1964), *cert. denied*, 379 U.S. 1000 (1965); *Clarke v. State*, 218 Tenn. 259, 402 S.W. 2d 863, *cert.* denied, 385 U.S. 942 (1966). This test proved unreliable because it could not distinguish between nitrates deposited on the hand from the firing of a handgun and nitrates deposited on the hands of persons who had come in contact with such common substances as explosives, fireworks, fertilizers, pharmaceuticals, leguminous plants (peas, beans, alfalfa), and burning tobacco products such as cigarettes. 5 Am. Jur. Proof of Facts, Firearms Identification 119-20 (1960). Apparently because of this fact, participating experts in the 1963 seminar on the scientific aspects of police work conducted by the International Criminal Police unanimously rejected the dermal nitrate test as being without value. Moenssens, Moses and Inbeau, Scientific Evidence in Criminal Cases § 4.12 (1973).

"According to the testimony of Mr. Cone, antimony, barium and lead will in 'rare circumstances' be found on the

hands of persons who have not fired a handgun. Even so, by reason of the location and the level of concentrations of the test elements on the subject's hands he is able to determine the probability, great or small as the case may be, whether the test substances came from the discharge residues of a handgun or from some other source. In our view, the test employed by Mr. Cone in this case avoids the pitfalls inherent in the dermal nitrate test and demonstrably possesses the degree of reliability required to render it competent. We hold that evidence of the results of the test was properly admitted."

The same test with the same safeguards was employed here. Its results were admissible.

[11]  Mr. Cone went on, however, to testify about a second test and its results. This test was performed on State's Exhibit 11, a pair of trousers defendant was wearing on the day of the killing. Mr. Cone gave the following description of the test:

"I used a sheet of eight by ten photographic film which had been impregnated with 0.5 percent sulfanilic acid and 0.5 percent alpha naphthalamine. The clothing is placed over this photographic paper after the material has dried with the side on which you are examining for residue against the photographic film. This is then covered with a piece of cheesecloth which has been soaked in a solution of twenty-five percent acetic acid. A sheet of clean paper is then placed on this. This material together is placed in a heat press and heated for approximately two to three minutes and the results observed on the photographic film. The presence of nitrite particles will be indicated by a reddish-orange spot on the photographic film.

"As a result of this procedure, I found one particular area on State's Exhibit 11 between the belt loops along the waistband on the right side just slightly above and to the front of the right rear pocket."

After an extensive voir dire, the trial court ruled that Mr. Cone could give his opinion of the significance of the results of this test. He then testified as follows:

State v. Sparks

"Q. . . . Agent Cone, based upon your training and your experience in the field of forensic chemistry, and based upon your examination and test upon State's Exhibit No. 11, do you have an opinion satisfactory to yourself as to the significance of the concentration that you found on State's Exhibit No. 11?

MR. CAHOON: Objection.

COURT: Overruled.

EXCEPTION NO. 179

A. Yes, sir, I do.

Q. And what is that opinion?

EXCEPTION NO. 180

A. It is my opinion that the area between the belt loops which were circled with the black letter referred to the presence of nitrite particles originating from burned gunpowder or some other compound containing nitrite particles.

Compounds containing nitrite particles are those which have undergone some sort of reaction to reduce nitrate to nitrite. One possibility might be something like cigarette residue, that is ashes or smoke."

In essence, then, the testimony of Mr. Cone was that (1) he performed certain tests, (2) the tests showed the presence of nitrites, and (3) nitrites are produced by, among other substances, burned gunpowder.

"Scientific tests of this nature are competent only when shown to be reliable." *State v. Crowder, supra,* 285 N.C. at 53, 203 S.E. 2d at 46. There is no question raised that the test performed by Mr. Cone is reliable insofar as it shows the presence of nitrite particles. As for showing that the nitrite particles resulted from the discharge of a firearm, however, this test itself, like the paraffin test referred to in *Crowder,* is inconclusive.

Here, however, Mr. Cone did not attempt to conclude as a result of this test that defendant had discharged a firearm. Rather, he merely stated (1) there were nitrite particles on defendant's clothing and (2) these particles originated "from burned

gunpowder or *some other compound containing nitrite particles*."
(Emphasis added.) His testimony was thus limited to a reliable
conclusion arising from the test he performed, *i.e.*, that there
were nitrite particles on defendant's clothing, coupled with a
scientific fact within his knowledge as an expert forensic chemist.

Given that the test was reliable for the purpose for which it
was used, the question remains whether the results testified to
were relevant. *See State v. Gray*, 292 N.C. 270, 282-84, 233 S.E. 2d
905, 913-15 (1977). As Mr. Cone testified, nitrites can result from
the reduction of compounds other than gunpowder. The nitrite
particles on defendant's clothing could, for example, have come
from cigarette smoke. Where, however, as here, there is other
evidence tending to show that the subject of the test discharged a
firearm, the presence of nitrite particles is relevant insofar as it
is consistent with that evidence. While they may not have in-
dependent evidentiary significance, the results of the test per-
formed here are to some extent corroborative of other evidence
tending to show defendant discharged a firearm. The results were
thus properly admitted. Their weight was for the jury.

[12]   Under his sixth assignment of error defendant groups some
ten unrelated exceptions to rulings by the trial court limiting the
scope of his cross-examination of prosecution witnesses. We have
examined each of defendant's contentions and conclude that the
trial court did not err in its rulings. We need discuss only one of
them here.

On cross-examination, Robin Diane Phillips stated, "I was go-
ing with [Darrell] Stone. We were more or less living at Kelly's
[defendant's] mother's house." The following exchange then took
place:

"Q. You didn't testify to that in 1973, did you, that you
were staying at Kelly's house, did you?

A. I believe I did.

Q. You never mentioned his mother or his mother's
house in 1973, did you?

MR. GREESON: Objection. She has answered the question.

MR. CAHOON: I am going to give her another chance.

COURT: Objection sustained.

EXCEPTION NO. 108

Q. If you did so, would you be kind enough to look at your testimony in the transcript there in front of you, beginning at page 60, and find it in there where you ever mentioned Kelly's mother or Kelly's mother's house?"

After some considerable discussion of the matter, the court ruled that it would not allow the witness to be cross-examined in this manner, *i.e.*, by reading silently through the transcript of the former trial in an effort to find a particular statement. Defendant argues this was error.

In so arguing, defendant relies on *State v. Alston*, 294 N.C. 577, 243 S.E. 2d 354 (1978). Defendant in *Alston* was charged with kidnapping, armed robbery and felonious assault. He testified that his gun, which had been connected with the alleged crimes, was in his unlocked trailer at the time the crimes were committed. On direct examination, he stated that he had testified to this effect at a former trial. On cross-examination the district attorney was permitted to ask defendant to point out the testimony in the transcript of the former trial.

This Court found no error in the cross-examination of defendant in this manner, stating, 294 N.C. at 587-88, 243 S.E. 2d at 361-62:

"In this jurisdiction, the scope of cross-examination covers a wide range. It is permissible to impeach or impair the credibility of a witness. The materiality and extent of cross-examination are matters which are largely within the discretion of the trial judge. *State v. Penley*, 277 N.C. 704, 178 S.E. 2d 490 (1971); *State v. Sheffield*, 251 N.C. 309, 111 S.E. 2d 195 (1959).

Here it is obvious that defendant was being cross-examined for the purpose of impeaching him, and we find no abuse of discretion in the ruling of the trial judge. Further, defendant had already testified that he knew that the transcript of the previous trial did not contain any statement about the location of the gun. Thus, his objection to this question was of no avail since evidence of like import had

already been admitted without objection. *State v. Van Land-ingham*, 283 N.C. 589, 197 S.E. 2d 539 (1973)."

When properly read *Alston* is not a blanket endorsement of this tactic of impeachment. The case merely holds that under its particular factual circumstances there was no abuse of discretion in allowing such impeachment. Moreover, the witness in *Alston* demonstrated considerable familiarity with the transcript, having stated unequivocally that the statement in question was not in it.

Here the witness merely said she "believed" she had made a similar statement in an earlier trial. The matter under inquiry was of only marginal relevancy. The trial judge took into consideration the potential delay involved while the witness searched for her statement and concluded that he would not permit this form of impeachment. Defendant was otherwise given wide latitude in his cross-examination of this witness. Taking all these factors into account, we find no abuse of discretion on the part of the trial judge.

[13] Defendant by his seventh assignment of error challenges the denial of his motion for a mistrial on the basis of certain testimony by Norman Edward Anderson, which was admitted over defendant's objection. Anderson was a police officer for the City of Gibsonville. He testified that he went to the lift station where the killing occurred in response to a radio message he received about 6:25 or 6:30 a.m. on 30 June 1973. On arrival, he observed that Chief Lashley had been shot and asked what happened. Darrell Stone replied that "Kelly had shot the Chief." It is to this last statement that defendant objects.

It is clear from the context of the testimony that this statement was offered for one or both of two purposes: (1) to corroborate the testimony of Darrell Stone, or (2) to prove the truth of the matter asserted. If not admissible for one of these purposes, it should have been excluded.

This statement did not corroborate Darrell Stone's testimony. He never testified that Sparks killed Chief Lashley. Stone admitted on cross-examination that he did not see a gun in Sparks' hand at the time of the killing and that he did not see Sparks shoot Chief Lashley. The substance of his testimony was that Sparks was in the doorway opposite Chief Lashley; a shot

was fired; Lashley was hit; and Sparks ran into the woods. While a conclusion might be drawn from this evidence that Sparks killed Chief Lashley, this conclusion was for the jury. *See State v. Lindley*, 286 N.C. 255, 210 S.E. 2d 207 (1974). Stone's out-of-court conclusion was therefore not admissible to corroborate his in-court testimony.

Anderson's repetition of what Stone said is clearly hearsay. It is thus not admissible unless it falls within one of the exceptions to the hearsay rule. The state contends that it does in that it was a "spontaneous utterance." We cannot agree.

"Declarations are competent as part of the res gestae if the declaration (1) is of such spontaneous character as to preclude the likelihood of reflection and fabrication, (2) is made contemporaneously with the transaction, or so closely connected with the main fact as to be practically inseparable therefrom, and (3) has some relevancy to the fact sought to be proved." *State v. Cox*, 289 N.C. 414, 420, 222 S.E. 2d 246, 251 (1976). The statement offered here meets neither the first nor the second of these requirements. According to the testimony of both Stone and Vance Thomas Evans it was several minutes before Anderson arrived. This case is thus indistinguishable from *Gray v. Insurance Co.*, 254 N.C. 286, 118 S.E. 2d 909 (1961). Plaintiff in *Gray* brought suit as a beneficiary under an accidental death insurance policy. Her decedent was shot while attempting to break into a store. A policeman arrived on the scene a few minutes after the shooting and asked decedent what happened. He replied, "We tried to break in and I got shot." The Court held that this statement was not admissible as a spontaneous utterance. The same result must follow here.

Given that the statement was inadmissible, there still remains the question whether its admission into evidence was prejudicial. G.S. 15A-1443(a) provides: "A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice under this subsection is upon the defendant."

In this respect the present case is much like *State v. Watson,* 294 N.C. 159, 240 S.E. 2d 440 (1978). In *Watson* a witness for the prosecution was permitted to repeat to the jury his statement to police officers that defendant and two others had "ripped off Johnson's Service Station." Two police officers corroborated this testimony. The witness had not observed the robbery. He merely concluded on the basis of a number of other facts he knew that defendant had participated in it. This Court held that his statement was inadmissible but concluded nevertheless that considering "the extensive evidence against defendant, we are convinced that the result would have been the same had the trial court properly excluded the opinion statement by the witness and the accompanying corroborative testimony." *Id.* at 166, 240 S.E. 2d at 445.

So it is here. The state presented evidence that: (1) the .25 caliber pistol with which Chief Lashley was shot was under the seat on the driver's side of the car; (2) defendant was crouched in the doorway on the driver's side; (3) just before the fatal shot was fired defendant was looking over his shoulder at Chief Lashley; (4) immediately after the shot, defendant ran toward the woods; (5) as he ran, he threw down the pistol; and (6) a scientific test showed he had fired a gun. In light of the strength of this evidence we conclude there is not a reasonable possibility that a different result would have been reached had the hearsay testimony as to Stone's conclusion been excluded.

[14] By his eighth and ninth assignments of error defendant claims that the trial court erred (1) in allowing the court reporter to read from the transcript of defendant's 1973 trial in this same case, and (2) denying his motion for mistrial on the ground that the jurors were permitted to examine the transcript of the 1973 trial. With regard to the first point, the court reporter read only those portions of the transcript containing testimony by persons who testified at the present trial. Testimony at a former trial is admissible for corroborative purposes. 1 Stansbury's North Carolina Evidence § 145 (Brandis rev. 1973). It was so used here. Defendant's assignment of error is without merit.

[15] In respect to his motion for a mistrial, defendant argues that the jurors might have seen his conviction and death sentence in the earlier case and he might thereby have been prejudiced.

Without replying to the merits of his argument we note simply that there is no indication in the record that the jury was allowed to examine the transcript. When the exhibits were being passed to the jury the court said: "I don't see any point in passing the transcript around. They have heard it read and they wouldn't have time to read it again anyway. I don't think we need to pass the transcript around." There is nothing in the record to show any contrary action. This assignment of error is simply not supported by the record.

[16] Under his eleventh assignment of error, defendant argues that the trial court erred in imposing a life sentence against him upon his conviction for first degree murder. According to defendant, on 30 June 1973, the date of the crime charged, the only penalty for first degree murder was death. This penalty was invalidated. Therefore, defendant argues, the maximum penalty he can receive consistent with the *ex post facto* clauses of the North Carolina and United States Constitutions is imprisonment for ten years under G.S. 14-2. This argument was raised and rejected in a carefully reasoned opinion by Chief Justice Sharp in *State v. Davis, supra,* 290 N.C. 511, 227 S.E. 2d 97. This assignment of error is overruled.

[17] By his twelfth assignment of error, defendant contends that the trial court erred in refusing to set bail while the case was on appeal. Under G.S. 15A-536, it is within the discretion of the trial court to grant or deny bail while a case is pending on appeal following conviction of defendant in superior court. *See* Official Commentary, G.S. 15A-536. No abuse of discretion was shown here.

We have examined the remainder of defendant's exceptions and assignments of error and conclude they do not merit discussion. In the trial there was

No error.

Justices COPELAND, BRITT and BROCK did not participate in the consideration or decision of this case.